## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF DELAWARE, *ex rel.* MALIKA SPRUILL and DOUGLAS SPRUILL, | §<br>§<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | C.A. No. 19-cv-475-CFC |
| v. | §<br>§<br>§ | <u>FILED UNDER SEAL</u><br><u>PURSUANT TO</u><br>The False Claims Act |
| CONNECTIONS COMMUNITY SUPPORT PROGRAMS, INC. and CATHY DEVANEY MCKAY, | §<br>§<br>§<br>§<br>§ | 31 U.S.C. § 3730(b)(2), and the Delaware False Claims and Reporting Act, 6 *Del. C.* § 1201 *et seq.* |
| Defendants. | §<br>§<br>§<br>§<br>§<br>§ | TRIAL BY JURY OF TWELVE (12) DEMANDED pursuant to F.R.C.P. Rule 38(b) and D. Del. LR 38.1 |

## FIRST AMENDED COMPLAINT

OF COUNSEL:

Brian Mahany (WI 1065623)
Tim Granitz (WI 1088934)
MAHANYLAW
8112 West Bluemound Road
  Suite 101
Wauwatosa, WI 53213
Tel: (414) 258-2375
Facsimile: (414) 777-0776

Kyle J. McGee (# 5558)
Laina M. Herbert (# 4717)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000

*Attorneys for Plaintiff-Relators Malika Spruill and Douglas Spruill*

Date: June 21, 2019

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ................................................................ 1

I.        JURISDICTION AND VENUE ........................................ 19

II.       THE PARTIES ................................................................ 21

III.      FACTUAL BACKGROUND ............................................ 28

       A.     Connections' Bill-To Pattern and Practice. ......... 28

       B.     Malika Spruill ...................................................... 36

       C.     Dr. Akinlawon Olugbenga Ayeni. ....................... 52

       D.     Fabrication of Medical Records. .......................... 54

       E.     Medically Unnecessary Intake Sessions. ............. 64

       F.     Manipulation of Length of Services Provided to Meet Arbitrary Billing Targets. ........................... 68

       G.     Dosing Clients Before They Are Seen By A Physician and A Licensed Provider. ................... 72

       H.     Connections Bills DSAMH and Medicaid for the Same Claims ........................................................ 73

       I.     Connections Submits Claims to Medicare Knowing Such Claims Will Be Rejected, and Then Submits the Claims to DSAMH. .......................... 74

       J.     Connections Unbundles Billing Codes to Fraudulently Increase Reimbursement ................ 75

IV.      GOVERNING LAW .......................................................... 76

       A.     Medicare ............................................................... 76

       B.     Medicaid ............................................................... 82

       C.     Licensed Clinical Social Worker ......................... 86

**D.**     Federal False Claims Act ....................................... 87

**E.**     Delaware False Claims and Reporting Act .......... 89

ADDITIONAL FALSE CLAIMS ACT AND DELAWARE FALSE CLAIMS
AND REPORTING ACT ALLEGATIONS ............................................ 91

COUNT I VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C.
§ 3729(A)(1)(A) AGAINST ALL DEFENDANTS ............................... 100

COUNT II VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C.
§ 3729(A)(1)(B) AGAINST ALL DEFENDANTS ............................... 103

COUNT III VIOLATION OF THE DELAWARE FALSE CLAIMS AND
REPORTING ACT, 6 *DEL. C.* § 1201(A)(1) AGAINST ALL DEFENDANTS 107

COUNT IV VIOLATION OF THE DELAWARE FALSE CLAIMS AND
REPORTING ACT, 6 *DEL. C.* § 1201(A)(2) AGAINST ALL DEFENDANTS 110

COUNT V VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C.
§ 3729(A)(1)(A) AGAINST ALL DEFENDANTS ............................... 113

COUNT VI  VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C.
§ 3729(A)(1)(B) AGAINST ALL DEFENDANTS ............................... 116

COUNT VII VIOLATION OF THE DELAWARE FALSE CLAIMS AND
REPORTING ACT, 6 *DEL. C.* § 1201(A)(1) AGAINST ALL DEFENDANTS 120

COUNT VIII VIOLATION OF THE DELAWARE FALSE CLAIMS AND
REPORTING ACT,  6 *DEL. C.* § 1201(A)(2) AGAINST ALL DEFENDANTS 123

COUNT IX VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C.
§ 3729(A)(1)(A) AGAINST ALL DEFENDANTS ............................... 126

COUNT X VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C.
§ 3729(A)(1)(B) AGAINST ALL DEFENDANTS ............................... 130

COUNT XI VIOLATION OF THE DELAWARE FALSE CLAIMS AND
REPORTING ACT,  6 *DEL. C.* § 1201(A)(1) AGAINST ALL DEFENDANTS 135

COUNT XII VIOLATION OF THE DELAWARE FALSE CLAIMS AND
REPORTING ACT, 6 *DEL. C.* § 1201(A)(2) AGAINST ALL DEFENDANTS 139

COUNT XIII RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(H)(1) AGAINST ALL DEFENDANTS ........................................................................ 143

COUNT XIV RETALIATION IN VIOLATION OF 6 *DEL. C.* § 1208 AGAINST ALL DEFENDANTS ........................................................................ 146

COUNT XV RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(H)(1) AGAINST ALL DEFENDANTS ........................................................................ 149

COUNT XVI RETALIATION IN VIOLATION OF 6 *DEL. C.* § 1208 AGAINST ALL DEFENDANTS ........................................................................ 152

**V.**      PRAYER FOR RELIEF .................................................................. 154

**VI.**     JURY TRIAL DEMANDED .......................................................... 156

## SUMMARY OF THE ACTION

1.     This *qui tam* civil action seeks to recover monetary losses and civil penalties on behalf of the United States of America (the "Government") and the State of Delaware ("Delaware" or the "State") against Defendants Connections Community Support Programs, Inc. ("Connections") and Cathy Devaney McKay ("McKay," and together with Connections, "Defendants") pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (hereinafter "FCA"), and the Delaware False Claims and Reporting Act, 6 *Del. C.* §§ 1201 *et seq.* (hereinafter "DFCRA"), arising from Defendants' multiple fraudulent practices, including *inter alia*, knowingly presenting or causing to be presented false or fraudulent claims for reimbursement to the Medicare and Medicaid programs and/or knowingly making, using or causing to be made or used false records or statements material to false or fraudulent claims to the Medicare and Medicaid programs for reimbursement that:

    a.   use Relator Malika Spruill's ("Ms. Spruill's") unique National Provider Identifier ("NPI"), which are designed to state or imply that Ms. Spruill, a licensed clinical social worker ("LCSW"), provided or supervised the provision of the services to Connections' clients, notwithstanding that, in fact, unlicensed and unsupervised providers, who are not entitled to bill for their

services, provided these services, in an attempt to cause, and in fact causing, the Government and Delaware to pay out more money than they owe for these services;

b. use Dr. Akinlawon Olugbenga Ayeni's ("Dr. Ayeni") NPI, which are designed to state or imply that Dr. Ayeni, a physician, provided or supervised the provision of the services to Connections' clients, notwithstanding that, in fact, unlicensed and unsupervised providers, who are not entitled to bill for their services, provided these services, in an attempt to cause, and in fact causing, the Government and Delaware to pay out more money than they owe for these services;

c. concealed that Defendants fabricated medical records, including that physicians' incomplete medical records were completed by Connections' personnel months after the fact without any background or knowledge as to the clients' condition or treatment provided; recovery plans were submitted several months late and were "completely wrong and could cause issues with an audit;" information for one client was scanned into another client's chart; Connections' employees were ordered to "fraudulently sign[] documents and/or add[] unknown

2

milligrams of medications on documents;" multiple HIPPA violations; and Connections' employees knew the status of Connections' documentation was "not good!";

d.  concealed the whirlwind of fraudulent activity at Connections prior to external audits whereby Defendants attempted to hide hundreds of unsigned documents," including "the recovery plans, which [were] clearly out of compliance;" McKay's orders to "just start signing" unsigned documents despite knowing "they are not all correct;" orders to clean up the charts "scattered across the floors and around the desks" and "under desks, on the floor, in drawers, etc." and to conceal the fact that Connections' staff lacked the necessary training and certifications to comply with the Division of Substance Abuse and Mental Health's ("DSAMH") requirements and other regulations;

e.  concealed medically unnecessary intake sessions designed to increase Connections' profits;

f.  concealed that Defendants manipulated the length of services Connections provided by seeking reimbursement for more time than they actually spent with clients, Connections' providers double-booked clients and fabricated their schedules to make it

look like providers were seeing clients after they had clocked out and left the facility -- all to reach arbitrary billing targets designed to increase Connections' bottom line;

g.  concealed that Defendants dosed clients before they were seen by Connections' doctors and licensed counselors and billed clients, *i.e.* Medicaid, Medicare or DSAMH, for the clients' dosing at the clinics when they were not;

h.  concealed that Connections bills and is reimbursed by DSAMH and Medicaid for the same claims;

i.  concealed that Connections submits claims to Medicare knowing such claims will be rejected, and then submits the claims to DSAMH; and

j.  concealed that Connections unbundled Intensive Outpatient Program ("IOP") services when it fails to provide the minimum required nine hours of weekly contact to increase its reimbursement.

**Defendants' Improper Use of Ms. Spruill's NPI**

2.      Any use of Ms. Spruill's NPI to make or submit claims for reimbursement to Medicare or Medicaid for professional services she did not personally perform, and not personally performed by staff members that Ms.

4

Spruill's supervised, is unlawful and causes the Government and Delaware to overpay Connections.  This case challenges Defendants' use of fraudulent practices to divert federal and State funds via the Medicare and Medicaid programs -- funds desperately needed to effectively combat grave societal problems such as the prevalence of substance use disorders in Delaware and the opioid epidemic in particular -- to their own pockets.  As alleged in more detail below, Relators Ms. Spruill and Mr. Spruill (collectively, "Relators") possess documentary evidence of Connections' practice of making or presenting false claims using Ms. Spruill's NPI to obtain Government and State funds to which it was not entitled.

3.      Under the applicable rules, Ms. Spruill was permitted to submit or cause to be submitted, under her NPI, claims for professional services she personally provided to Medicare or Medicaid beneficiaries.  Moreover, a limited set of individuals supervised by Ms. Spruill were permitted to submit or cause to be submitted, under Ms. Spruill's NPI, claims for professional services such individuals provided under Ms. Spruill's supervision to Medicaid beneficiaries.  This case is not about such claims.

4.      Ms. Spruill supervised the following unlicensed staff in the Dover clinic, and therefore, these individuals were permitted to bill Medicaid for services they performed under Ms. Spruill's supervision using Ms.

5

Spruill's NPI: Alyssa Lucas ("Lucas"), a Counselor II to Counselor I who became a Certified Alcohol and Drug Counselor ("CADC"); Alex Cropper ("Cropper"), a Counselor I and CADC; Shaneka Geipel ("Geipel"), a Counselor I who became a CADC; Cat Montefusco ("Montefusco"), a Counselor II to Counselor I who became a CADC; Roderick Anderson ("Anderson"), a Counselor II; Edwin Motten ("Motten"), a Counselor II; Johanna Truax ("Truax"), a Master's level Counselor II; Devon Duker Hanzer ("Hanzer"), a Counselor II; Diara Miller ("Miller"), a Counselor II; and Jarrett Cagel ("Cagel"), a Counselor II.  After the rules changed, CADCs were permitted to bill Medicaid directly, and should have done so.

5.      Ms. Spruill also supervised certain staff in Connections' Smyrna clinic from August 2015 through January 2016, and two individuals in the Wilmington clinic, including Heather Emmerick ("Emmerick"), a CADC in the Smyrna clinic, and Theresa Sharp ("Sharp") in the Wilmington clinic.  All of the individuals Ms. Spruill supervised during this time in the Smyrna and Wilmington clinics had Master's degrees, and should have billed under CADC rates.

6.      Moreover, under the applicable rules, if other LCSWs, Licensed Professional Counselors of Mental Health ("LPCMHs") or Licensed Marriage and Family Therapists ("LMFTs") submitted or caused to be submitted claims

6

for professional services that they personally provided to Medicaid beneficiaries under Ms. Spruill's NPI, Medicaid would have reimbursed Connections the same amount as if Ms. Spruill had personally performed those services. Therefore, although this practice is inappropriate (because such licensed professionals are not authorized to use Ms. Spruill's NPI), the Government and Delaware would have paid Connections the same amounts they would have paid in the event such licensed professionals used their own NPIs. Accordingly, Ms. Spruill does not seek damages for claims submitted by or on behalf of LCSWs, LMFTs or LPCMHs for services personally performed by these LCSWs, LMFTs or LPCMHs, and submitted to Medicaid for reimbursement under Ms. Spruill's NPI.

7.     Relators seek recovery of damages suffered by the Government and Delaware as a result of claims for reimbursement submitted to Medicare or Medicaid by or on behalf of unlicensed, un-credentialed or lower-level individuals who Ms. Spruill never supervised, or who Ms. Spruill was not supervising at the time they used Ms. Spruill's NPI to submit claims for reimbursement to Medicaid, including but not limited to the following:

      a.  any Connections' staff who worked in the Harrington clinic, as Ms. Spruill never supervised any staff in the Harrington clinic;

b.  any staff in the Newark clinic from August 2013 through October 6, 2014, as Ms. Spruill was not a supervisor while she was working in the Newark clinic during this period; and

c.  any staff other than (i) Lucas, Cropper, Geipel, Montefusco, Anderson, Motten, Truax, Hanzer, Miller, or Cagel in the Dover clinic; (ii) staff under Ms. Spruill's supervision in the Smyrna clinic from August 2015 to January 2016; and (iii) staff under Ms. Spruill's supervision in the Wilmington clinic from August 2015 to January 2016.

8.  Medicare does not reimburse, *inter alia*, CADCs, Certified Social Workers, Drug and Alcohol Rehabilitation Counselors, Licensed Alcoholic and Drug Counselors ("LADCs"), Licensed Professional Counselors ("LPCs"), LMFTs, persons holding a Masters of Social Work, or Mental Health Counselors.  Thus, Ms. Spruill also seeks damages for claims for reimbursement submitted to Medicare by or on behalf of CADCs, Certified Social Workers, Drug and Alcohol Rehabilitation Counselors, LADCs, LPCs, LMFTs, persons with a Masters of Social Work or Mental Health Counselors using Ms. Spruill's NPI regardless of whether Ms. Spruill supervised them.

8

9.     Medicare does not authorize LCSWs to bill for services furnished as an incident to their own processional services.  In other words, a LCSW may not bill Medicare for services s/he orders as part of an active treatment plan that are integral, although an incidental part of the LCSW's professional service, and are furnished by another individual under the LCSW's direct supervision.  Thus, Relators also seek damages for claims for reimbursement submitted to Medicare by or on behalf of unlicensed, un-credentialed individuals who used Ms. Spruill's NPI to submit claims for reimbursement to Medicare.

10.     Although Relators' complaint alleges the improper use of Ms. Spruill's NPI by unlicensed providers Ms. Spruill did not supervise, the practice of Connections' unlicensed and unsupervised employees and agents using licensed qualified healthcare providers' NPIs for Medicare and Medicaid billing purposes is not limited to Ms. Spruill, but extends to several of Connections' other licensed qualified healthcare providers.

**Defendants' Improper Use of Dr. Ayeni's NPI**

11.     This *qui tam* action also seeks to recover monetary losses and civil penalties on behalf of the Government and Delaware against Defendants pursuant to the FCA and the DFCRA arising from Defendants' practice of knowingly presenting or causing to be presented false or fraudulent claims for

reimbursement and/or knowingly making, using or causing to be made or used false records or statements material to false or fraudulent claims to federal Medicare and state Medicaid for reimbursement that use Dr. Ayeni's NPI, which are designed to state or imply that Dr. Ayeni, a physician, provided the services to Connections' clients or supervised the provision of these services, notwithstanding that, in fact, unlicensed and unsupervised providers, who are not entitled to bill for their services, provided the services to Connections' clients, in an attempt to cause, and in fact causing, the Government and Delaware to pay out more money than they owe for these services.

12.    Additionally, Connections knowingly billed the Government, through its federal Medicare and state Medicaid programs and Delaware's DSAMH program, for services purportedly provided by Dr. Ayeni using his NPI, despite that these services were not performed by Dr. Ayeni, or supervised by Dr. Ayeni.   Instead, these services were provided by Connections' unlicensed agents or employees who are not entitled to bill for reimbursement from Medicare and/or Medicaid, unless properly supervised. Such action was designed to state or imply that Dr. Ayeni provided these services and/or supervised the provision of these services to Connections' clients, which is untrue.

13.    Defendants have engaged in at least the following further schemes to defraud the Government and Delaware.

**Defendants' Fabrication of Medical Records**

14.    Connections must comply with all of the conditions and requirements set by Medicaid, Medicare and DSAMH, including but not limited to submitting reimbursement for services that *were actually provided* to the clients, services that were medically necessary and correctly coding those services when submitting a claim.  As described herein, when physicians fell behind on recordkeeping, or were terminated, their records were completed months later by Connections' employees who had no information on the clients' underlying conditions or the treatment provided.  Connections' providers not only submitted late and incomplete records, but they were so inaccurate that Ms. Spruill refused to sign many of them.  Other employees were ordered to "fraudulently sign[] documents and/or add[] unknown milligrams of medications on documents (because the client hadn't done so)."  This case challenges, and Relators possess documentary evidence of, Connections' practice of making or presenting false claims using these fabricated medical records.

**Defendants Conceal Their Noncompliance From External Auditors**

15.     When faced with external audits by officials who could put Connections out of business, Defendants covered up their noncompliance by hiding the hundreds of unsigned documents in their records and cleaning up the "under desks, on the floor, in drawers, etc." and scurrying to get locks for cabinets that were required to be locked.  This case challenges Connections' noncompliance with Medicaid, Medicare and DSAMH's requirements despite the appearance that it did when audited.  As described in detail herein and in the documentary evidence Relators possess, by way of example only, Mr. Spruill notified his superiors that the Harrington clinic was out of compliance in multiple areas.  Six months later, Connections took corrective action against Mr. Spruill by offering him a demotion, severance package or termination, and seven months later, terminated him.

**Defendants Conceal Medically Unnecessary Intake Sessions Designed to Increase Connections' Profits**

16.     According to the Manual (defined below), Connections is to be reimbursed at predetermined rates for providing specific, medically-necessary alcohol and drug treatment services.  Connections requires its new clients to participate in an intake session so providers may determine the level of services each client should receive.  When current Connections' clients, who

are receiving medication-assisted therapy ("MAT") services for opioid addiction, miss three consecutive days of dosing, Connections requires them to submit to another intake, rather than allowing them to speak with an on-call physician. These medically-unnecessary intakes are usually conducted at the Harrington clinic because it is the only clinic that offers around-the-clock intakes, at the cost of $337.27. Following this intake, clients are returned to their "home" clinic and treatment continues as it did prior to the intake. As described herein, this case challenges these fraudulent, medically unnecessary intakes and the "23-hour" program that follows, which serve only to increase Connections' bottom line.

### Defendants' Improperly Manipulated the Length of Services Connections Provided to Clients

17.    When Connections submits claims for reimbursement for MAT services, it is representing that the client was seen for the amount of time that it billed for. Not so. As described herein and in Relators' documentary evidence, Connections billed Medicare, Medicaid and DSAMH for the maximum time allowed for each service regardless of whether Connections' providers actually saw the client for that amount of time, or the minimum required time to submit the claim. In addition, Connections' providers double-booked clients and fabricated records to make it appear they were seeing clients after they had clocked out and left the facility. This case

13

challenges these fraudulent practices that were designed to reach arbitrary billing targets created to increase Connections' bottom line.

**Connections Doses Clients Before They Are Seen by a Physician and a Licensed Provider**

18.    This case challenges Connections' practice of dosing clients before they are seen by a doctor and a licensed counselor, and submitting claims for reimbursement as if they have been seen by such providers.  As described herein and in Relators' documentary evidence, dosing clients before they go through Connections' intake procedure and are seen by both a doctor and a licensed counselor is against Connections' policy.  Or, in Ms. Spruill's words:  "Ridiculous!"  "This CAN'T Happen!  Clients cannot be dosing with us for 2 months with us not seeing them!!!! If this person died on our watch, we would be screwed!!! Unacceptable!"

**Connections Bills and Is Reimbursed By DSAMH and Medicaid for the Same Claims**

19.    As described herein, this case challenges Connections' practice of submitting a claim to DSAMH for reimbursement for services provided to uninsured clients, enrolling the uninsured client in Medicaid and then submitting the same claim for reimbursement to Medicaid.  Ultimately, Connections receives and pockets reimbursement from both DSAMH and Medicaid for these claims.

**Connections Submits MAT Claims to Medicare Knowing Such Claims Will Be Rejected Before Submitting Them to DSAMH**

20.    This case challenges Connections' standard practice of submitting claims for MAT services to Medicare knowing such claims will be denied.  After Medicare denies these claims, Connections submits them to DSAMH for reimbursement relying on DSAMH's coverage of necessary treatment not otherwise covered by alternative sources.  While Medicare suffers no loss (other than wasted resources rejecting the claim), this practice constitutes submission or presentment of a false claim.

**Connections Unbundles IOP Services to Increase Reimbursement**

21.    To be reimbursed for IOP services, Connections must provide between nine and nineteen hours of contact per week, with a minimum of three contact days per week.  This case challenges Connections' practice of maximizing its reimbursement when it fails to provide nine hours of contact per week by unbundling IOP services and billing for them on a per unit basis, rather than a per diem basis.  Again, all in the name of generating more money for Connections' bottom line.

22.    Defendants' actions, as described herein, divert government funds -- paid by federal and Delaware taxpayers -- for health benefits to low income individuals and families, to themselves.  Thus, Defendants' actions directly deprive Delaware of money it needs desperately to fight significant

15

societal ills, such as substance use disorders and the opioid epidemic in particular, and rob Delaware's most vulnerable citizens of resources designated for their treatment.  Indeed, as Connections provides substance use disorder treatment, Defendants' fraudulent submissions of claims for reimbursement directly capitalizes on the ongoing opioid epidemic.

23.    In 2016, throughout the United States:

- 116 people died every day from opioid-related drug overdoses;

- 2.1 million people had an opioid use disorder;

- 948,000 people used heroin – 170,000 for the first time;

- 11.5 million people misused prescription opioids – 2.1 million for the first time;

- 17,087 deaths were attributed to overdosing on commonly-prescribed opioids;

- 19,413 deaths were attributed to overdosing on synthetic opioids other than methadone;

- 15,469 deaths were attributed to overdosing on heroin;

- Totaling $504 billion in economic costs.

24.    In 2017, throughout the United States:

- More than 130 people died every day from opioid-related drug overdoses;

- Drug overdose deaths involving any opioid—prescription opioids (including methadone), synthetic opioids, and heroin—rose from 18,515 deaths in 2007 to 47,600 deaths in 2017;

- 17,029 deaths were attributed to overdosing on prescription opioids;

16

- 28,400 deaths were attributed to overdosing on synthetic narcotics; and

- 15, 482 deaths were attributed to overdosing on heroin.

25.    The opioid crisis has had, and continues to have, a devastating impact on Delaware.  The Delaware Department of Health and Social Services ("DHSS") reported "[t]here were at least 291 deaths [in 2018] in Delaware from suspected overdoses. Tragically, the final number is expected to exceed 400 after all toxicology screens are finished (they take six-eight weeks) and final death determinations are made on outstanding cases by the Division of Forensic Science. The Centers for Disease Control and Prevention ranked Delaware as number six in the nation for overdose deaths in 2017."  As of June 16, 2019, DHSS reported 110 suspected overdose deaths in 2019.

26.    According to the Centers for Disease Control and Prevention, Delaware had the sixth highest increase in overdose deaths from 2015 to 2016 in the nation, with a 40% increase in drug overdose deaths in 2016.  Between 2016 and 2017, Delaware's drug overdose death rate increased 20.1%.

27.    When measured using emergency room and hospital billing data, Delaware's opioid overdose rate increased by 105% -- or more than three times the average of the 16 states participating in the Enhanced State Opioid Overdose Surveillance program  -- from the third quarter of 2016 to the third

quarter of 2017.  Delaware's increase over this period was higher than any of the 16 other participants, other than Wisconsin.

28.     In 2016, Delaware lost over 300 lives to overdose, 143 of these deaths were due to opioids.  The year before, in 2015, Delaware ranked third in the United States in per-capita health care costs from opioid abuse, and spent approximately $109.4 million in health care costs battling this crisis.  This staggering cost does not include the financial impact of the opioid epidemic on Delaware's' criminal justice system, social services, and educational resources.

29.     The Delaware Department of Justice has consistently highlighted the need "for Delaware to fund more treatment opportunities [in the areas of long-term residential treatment and sober living facilities] for those Delawareans with substance use disorder who are willing to seek treatment."

30.     Facing an uphill battle, DSAMH's approximately $24 million budget for addressing addiction and behavioral health does not stretch nearly far enough.  And, DHSS's Fiscal Year 2019 budget includes $990,000 for SUD assessment and referral to treatment of people who have overdosed or are suffering from addiction, and have been brought to emergency rooms.  It also includes $328,500 for 20 additional sober living beds, and $100,000 for naloxone.

31.     Connections holds itself out as Delaware's largest behavioral health provider, and is one of two Delaware treatment providers recently named to lead the Delaware Substance Use Treatment and Recovery Transformation (START) Initiative, which has been tasked with tackling access to treatment and navigating recovery from addiction.

32.     Defendants' conduct, as described herein, has allowed Connections to pocket enormous reported revenues (approximately $102 million in 2016 alone) under the guise of its nonprofit status, at the expense of vulnerable Delawareans.

33.     Defendants are and should be required to abide by the current Medicare and Medicaid billing requirements, rather than being rewarded with additional funding from new Delaware initiatives at a time when more than one million additional budget dollars are being devoted to fight this epidemic.

## I.     JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §§ 3730, 3732.

35.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because one or all of the Defendants can be found, resides or transacts

business in this District.  Specifically, Connections is incorporated in the State of Delaware, and maintains headquarters in Wilmington, Delaware.

36.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District.

37.     This suit is not based upon the prior public disclosure of the allegations or actions in a criminal, civil, or administrative hearing, or from the news media.  This suit is also not substantially based upon allegations or transactions, which are the subject of a civil suit or an administrative proceeding which the Government or Delaware is already a party.

38.     To the extent that there has been a public disclosure unknown to Relators, they are an original source of the information under 31 U.S.C. § 3730(e)(4) and 6 *Del. C.* § 1206(c).  Relators have direct and independent knowledge of the information on which the allegations are based, and pursuant to 31 U.S.C. § 3730(e)(4) and 6 *Del. C.* § 1206(c), voluntarily provided the information to the United States Attorney General, the United States Attorney for the District of Delaware, and the Attorney General of the State of Delaware before filing this *qui tam* action.

20

## II.    THE PARTIES

39.    Relator Malika Spruill ("Ms. Spruill") is a resident of Middletown, Delaware, and has knowledge of the factual allegations contained herein.

40.    Relator Douglas Spruill ("Mr. Spruill") is a resident of Middletown, Delaware, and has knowledge of the factual allegations contained herein.

41.    Mr. Spruill worked at Connections in various positions from 2002 through 2007, and again from January 2013 until he was terminated improperly in June 2019.  In June 2019, Mr. Spruill was the Site Director of the Harrington clinic.

42.    Defendant Connections is incorporated in Delaware, and its registered agent is Catherine DeVaney McKay, 3821 Lancaster Pike, Wilmington, Delaware 19805.

43.    Connections operates an outpatient medical and mental health clinic in Wilmington, and provides integrated mental health, substance abuse treatment, and primary care at its clinics in Newark, Smyrna, Dover, Harrington, and Millsboro.  It also has a satellite site in Seaford.  Connections claims its "clinics are staffed by physicians, nurse practitioners, psychiatrists, therapists, nurses and other health care and counseling professionals."

44.     Connections operates in more than 100 separate locations in Delaware, and provides primary care, mental health, substance abuse and sex offender treatment to more than 35,000 Delawareans, including all of the individuals who are incarcerated in Delaware's unified correctional system.

45.     In 2016, Connections became the provider of medical, mental health care and addiction treatment to the Caroline County Detention Center in Denton, Maryland.

46.     Today, Connections is one of Delaware's largest nonprofit organizations that "assists people with psychiatric and intellectual disabilities, as well as those with substance use disorders, homeless veterans and their families, families in crisis, and men and women who are incarcerated."

47.     Connections has more than 1,700 full-time employees who serve more than 42,000 people each year.

48.     Connections' current strategic plan calls for it to explore opportunities in nearby states.

49.     In response to the nation's deadly opioid epidemic, Connections partnered with DSAMH, the City of Harrington, and the USDA to open Connections Harrington Withdrawal Management Center Inpatient and Outpatient Services ("Harrington").  This clinic "is the primary place where residents of Kent and Sussex Counties receive safe and secure, medically

22

monitored withdrawal management services and treatment."  Harrington also provides support to those who are withdrawing from alcohol and other drugs. In addition, Connections operates sober living homes, the Women's Residential Treatment Center, New Expectations (a residential program for pregnant, justice-involved women with substance abuse issues who are facing incarceration), and DUI treatment programs.

50.    As of November 18, 2016, DSAMH reported the following licensure and Medicaid Certification information for twenty-nine of Connections' substance abuse and mental health programs in Delaware:

| PROVIDER INFORMATION | LICENSURE/CERTIFICATION STATUS (L=License;  C=Certification;  P= Provisional) |
|---|---|
| Connections, ACT — Dover (Paul's Team) Carroll's Plaza - 1114 South DuPont Highway, Suite # 103 Dover, DE 19901 302-336-8307 | Full C Provides services for persons with psychiatric disabilities. |
| Connections CSP ACT I 1423 Capitol Trail, Polly Drummond Office Plaza, Suite 3302 2nd Floor Newark, DE 19711 302-894-7900 | Full C Provides services for persons with psychiatric disabilities. |
| Connections CSP ACT II 500 W 10th Street Wilmington, DE 19801 | Full C |

| | |
|---|---|
| 302.230.9102 | Provides services for persons with psychiatric disabilities. |
| Connections CSP ACT III<br>2126 West Newport Pike, Suite 201<br>Wilmington, DE 19804<br>302.304.3350 | Full C<br><br>Provides services for persons with psychiatric disabilities. |
| Connections CSP ACT IV<br>1423 Capitol Trail, Polly Drummond Plaza, (Bldg. #3) (2nd Floor) 3202<br>Newark, DE 19711<br>302-428-9200 | Full C<br><br>Provides services for persons with psychiatric disabilities. |
| Connections CSP ACT V<br>801 West Street<br>Wilmington, DE 19801<br>(302) 232-5490 | Full C<br><br>Provides services for persons with psychiatric disabilities. |
| Connections CSP ACT (Paul's Team)<br>621 W. Division St.<br>Dover, DE 19901<br>302.672.9360 | Full C<br><br>Provides services for persons with psychiatric disabilities. |
| Connections CSP (AOD)<br>2205 Silverside Road, Suite 5<br>Wilmington, DE 19810<br>302.984.3380 | Full L<br><br>Provides        outpatient        DUI Treatment. |
| Connections CSP ACT IV New Castle<br>1423 Capitol Trail, Polly Drummond Office Plaza, Suite 3302<br>Newark, DE 19711 302.379.4174 | Full L<br><br>Provides services for persons with psychiatric disabilities. |
| Connections CSP Brandywine St. Women's Residential Treatment Program<br>822 North West Street<br>Wilmington, DE 19802<br>1-866-477-5345 | Full L<br><br>Provides Residential Services. |
| Connections CSP AOD Dover (Outpatient) | Full L |

| | |
|---|---|
| Carroll's Plaza located at 1114 South DuPont Highway Dover, DE 19901 1-866.477.5345 | Provides Outpatient Treatment Services. |
| Connections CSP (Opioid Treatment Program) Carroll's Plaza located at 1114 South DuPont Highway, Dover, DE 19901 1-866.477.5345 | Full L Provides medicated assistance treatment in an outpatient setting. |
| Connections Residential Detox 1-11 East Street, Spartan Station Shopping Center Harrington, DE 19952 1-866.477.5345 | Full L/Contracted Residential Detoxification Services Outpatient Treatment Services Opioid Treatment Services. |
| Connections AOD Millsboro (Outpatient Treatment) 315 Old Landing Road Millsboro, DE 19966 1-866.477.5345 | Full L Provides Outpatient Treatment Services. |
| Connections AOD Millsboro (Opioid Treatment) 315 Old Landing Road Millsboro, DE 19966 1-866.477.5345 | Full L Provides Opioid Treatment Services. |
| Connections Millsboro (Co-Occurring Treatment) 315 Old Landing Road Millsboro, DE 19966 1-866.477.5345 | New Provisional License Provides Co-Occurring Treatment Services. |
| Connections CSP (Opioid Treatment Program) 3304 Polly Drummond Office Plaza, Newark, DE 19711 1-866.477.5345 | Full L Provides medicated assistance treatment. |
| Connections CSP (AOD Outpatient) | Full L |

| | |
|---|---|
| 3304 Polly Drummond Office Plaza, Bldg. 3 Newark, DE 19711 1-866.477.5345 | Provides Outpatient Treatment Services. |
| Connections (Outpatient Treatment) Smyrna 320 High Street Smyrna, DE 19977 1-866.477.5345 | Full L<br><br>Provides Outpatient Treatment Services. |
| Connections (Opioid Treatment) Smyrna 320 High Street Smyrna, DE 19977 1-866.477.5345 | Full L<br><br>Provides Opioid Treatment Services. |
| Connections North Wilmington 2205 Silverside Road, Suite 5, Wilmington, DE 19810 1-866.477.5345 | Full L<br><br>Provides DUI Outpatient Treatment Services. |
| Connections (Co-Occurring Treatment) Wilmington 801 West Street Wilmington, DE 19810 1-866.477.5345 | New Provisional License<br><br>Provides Co-Occurring Treatment Services. |
| Connections CSP Blackbird Landing Group Home 994 Blackbird Landing Road Townsend, DE 19734 1-866.477.5345 | Full C<br><br>Group homes for people with psychiatric disabilities. |
| Connections CSP Camden Group Home 124 N West Street Camden, DE 19934 1-866.477.5345 | Full C<br><br>Group homes for people with psychiatric disabilities. |
| Connections CSP Cardinal Group Home 722 Cardinal Ave Bear, DE 19701 1-866.477.5345 | Full C<br><br>Group homes for people with psychiatric disabilities. |
| Connections CSP Clint Walker Group Home | Full C |

26

| | |
|---|---|
| 676 Black Diamond Rd<br>Smyrna, DE 19977<br>1-866.477.5345 | Group homes for people with psychiatric disabilities. |
| Connections CSP Gordy Place Group Home<br>204 Gordy Place<br>New Castle, DE 19720<br>1-866.477.5345 | Full C<br><br>Group homes for people with psychiatric disabilities. |
| Connections CSP Roxanna Group Homes<br>35906 Zion Church Rd.<br>Frankford, DE 19945<br>1-866.477.5345 | Full C<br><br>Group homes for people with psychiatric disabilities. |
| Connections CSP Still Road Group Home<br>2197 Still Road<br>Camden, DE 19934<br>1-866.477.5345 | Full C<br><br>Group homes for people with psychiatric disabilities. |

51.     In 2016, Connections earned $102,045,443 in reported revenues, 53% of which derives from the Delaware Department of Corrections; 15% from "other fees for service;" 14% from Delaware Health and Social Services; 13% from Medicaid; 5% from HUD; and 1% from contributions and grants.

52.     Defendant McKay is Connections' founder, chief executive officer and president.  McKay is a licensed associate marriage and family therapist, and has worked as a therapist and supervisor, and in the behavioral health industry since 1977.

## III.   FACTUAL BACKGROUND

### A.   Connections' Bill-To Pattern and Practice.

53.     Medicare and Medicaid reimburse, *inter alia*, physicians and LCSWs at a higher rate than they reimburse many other providers.  While Medicaid permits an employee who is supervised by a LCSW to bill under that LCSW's NPI, Medicare does not.   Therefore, Connections has an incentive to submit claims for reimbursement under a LCSW's NPI to fraudulently maximize the amount of reimbursement it receives from Medicare and Medicare.

54.     Similarly, when a non-LCSW or non-physician performs services on a Medicare client, Connections has three options: (a) not bill Medicare for the services because Medicare only reimburses LCSWs and physicians; (b) submit the claim to Medicare for reimbursement under the provider's NPI knowing Medicare will reject the claim, and then seek reimbursement from DSAMH; or (c) bill under Ms. Spruill or another LCSW's (or a physician's) NPI, as if Ms. Spruill, a LCSW or a physician performed the services.  Connections is only reimbursed for its services under the third option.

55.     Connections instructs its LCSWs to sign off on services they did not provide and work they did not supervise for reimbursement purposes,

despite Medicaid, Medicare and other managed care organizations reimbursing work done by different practitioners at different rates. For example, at a meeting attended by Ms. Spruill, McKay, Jevon Hicks, Sr. ("Hicks"), Connections' Director of Billing and Medical Records, Melissa Schneck ("Schneck"), Mohamed, Angie Walker ("Walker") and Bill Northey ("Northey"), McKay reported that United Healthcare was requiring LCSWs to supervise all counselors, and instructed the LCSWs that they must sign off on the counselor's work. At this meeting, the attendees raised the issue of different practitioners being reimbursed by Medicaid, Medicare and other managed care organizations at different rates, based on their licensing and qualifications. In response, McKay insisted that United Healthcare would only accept LCSW-reviewed work from any counselors that were providing services. Someone at this meeting asked about Highmark Delaware Health Options' ("Health Options") practices for reimbursing providers, and McKay and Hicks replied that it was easier for LCSWs to sign off on everything to make it less confusing.

56.    When any Connections employee, whether they be licensed or unlicensed, enters medical notes and/or other information into Connections' Electronic Healthcare Records system ("EHR"), EHR automatically populates the "bill to" person's name with the name of the person who is

entering the information into EHR.  Connections' providers are instructed by management to change the "bill to" person to the Licensed Clinician at the clinic where the services were provided by selecting the designated name from a list of populated names from a drop-down menu.[1]  If a provider fails to select the designated "bill to" person, then the billing staff and Connections' billing system, CareLogic, will reject that claim, and it will not be sent out for billing to the managed care organization.  Connections requires a LCSW to be selected as the "bill to" person, despite that the LCSW did not provide the services or supervise the provision of the services.

57.    According to the Delaware Adult Behavioral Health Service Certification and Reimbursement Provider Specific Policy Manual (Nov. 1, 2016) (the "Manual"), substance use disorder services (SUDs) may be provided by "licensed and unlicensed professional staff, who are at least 18 years of age with a high school or equivalent diploma, according to their areas of competence as determined by degree, required levels of experience as defined by State law and regulations and departmentally approved program guidelines and certifications."

---

[1] **Ex. 1** (1/24/18 10:04 am email from Jevon Hicks to Johanna Truax copying Lisa Clark and Malika McMeans-Spruill re: Billing errors).

58.   Service providers employed by addiction and/or co-occurring treatment services agencies, *i.e.* Connections, must work in a program licensed by DSAMH, comply with all relevant licensing regulations, and maintain their individual provider licenses.

59.   Licensed practitioners who may bill Medicaid for SUDs under Delaware regulation are licensed by Delaware, and include, but are not limited to LCSWs, LPCMHs and LMFTs, Nurse Practitioners ("NPs"), Advanced Practice Nurses ("APNs"), medical doctors (MDs and DOs), psychologists, and as of July 1, 2016, Licensed Chemical Dependency Professionals ("LCDPs") and CADCs.  Delaware licensure of practitioners does not drive Medicaid reimbursement.  For example, RNs are licensed, but not entitled to reimbursement from Medicaid, and are therefore grouped with "unlicensed staff."

60.   Under Delaware Medicaid, reimbursement for services, including crisis intervention services, outpatient addiction services and residential treatment services, are based upon a Medicaid fee schedule established by Delaware.  According to the Methods and Standards For Establishing Payment Rates For Other Licensed Behavioral Health Practitioners:  "If a Medicare fee exists for a defined covered procedure code, then Delaware will pay Psychologists at 100% of the Medicaid physician rates

31

as outlined under Attachment 4.19-B, item 5 [to the State Plan Under Title XIX of the Social Security Act State/Territory: Delaware]." If a Medicare fee exists for a defined covered procedure code, then Delaware Medicaid will pay LCSWs, LPCMHs and LMFTs at 75% of the Medicaid physician rates as outlined under Attachment 4.19-B, item 5.

61.     Licensed practitioners, such as psychologists, LCSWs, LPCMHs and LMFTs may bill Medicaid for eligible outpatient SUDs and for non-physician Licensed Behavioral Health Practitioner ("LBHP") codes.

62.     According to the Manual, "unlicensed staff," *e.g.* certified peers, will bill "using their licensed supervisor as the rendering provider number."

63.     Delaware also requires:

> **Any staff who is unlicensed and providing addiction services** must be credentialed by DSAMH and/or the credentialing board. Certified and Credentialed staff under State regulation for SUD services include certified recovery coaches, credentialed behavioral health technicians, RNs and LPNs, certified alcohol and drug counselor, internationally certified alcohol and drug counselor, certified co-occurring disorders professional, internationally certified co-occurring disorders professional internationally certified co-occurring disorders professional diplomat, and licensed chemical dependency professional (LCDP). Effective 7/1/2016, Licensed Chemical Dependency Professionals (LCPDs) will not be considered "unlicensed." **State regulations require supervision of recovery coaches and credentialed behavioral health technicians by a QHP meeting the supervisory standards established by DSAMH**. A QHP includes the following professionals who are currently registered with their respective Delaware board LCSWs,

32

LPCMH, and LMFTs, APNs, NPs, medical doctors (MD and DO), and psychologists. Effective 7/1/2016, LCDPs and CADCs will be included in the definition of a QHP. The QHP provides clinical/administrative oversight and supervision of recovery coaches and credentialed behavioral health technicians staff in a manner consistent with their scope of practice.

64.     The Manual reiterates:

Supervision

Behavioral Health technicians must receive clinical and administrative supervision and oversight by a qualified healthcare professional (QHP). A QHP includes the following professionals who are currently registered with their respective Delaware board LCSWs, LPCMH, LMFTs, APNs, NPs, medical doctors (MD and DO), and psychologists. Behavioral health technicians should have access to both individual and group supervisions.

65.     DSAMH's Bureau of Alcoholism and Drug Abuse Rules and Regulations' standards applicable to all alcohol and drug service providers require:

Drug and/or alcohol programs shall have all counselors certified by the Delaware Alcohol and Drug Counselor Certification Board, Inc. or the State Merit System, as meeting the minimum standards to practice in the field. Counselors having certification from other states must also have their certification approved by the D.A.D.C.C.B. in order to assure quality service.

Staff members who are not certified and are performing any counseling functions (e.g. interns, volunteers, etc.) shall receive documented clinical supervision from a certified counselor.

66.     Federal Medicare and Delaware Medicaid reimburse, *inter alia*, physicians and LCSWs at a higher rate than they reimburse many other providers.  Medicare does not permit LCSWs to bill for services "incident to" their own professional services.  Stated differently, even if a LCSW supervises an employee, that employee may not bill Medicare under the LCSW's NPI.  In addition, Delaware Medicaid does not permit unlicensed and unsupervised providers to bill for their services at all.  Thus, Connections has an incentive to submit claims using physicians' and LCSWs' NPIs for work performed by unlicensed and unsupervised providers that would otherwise be unreimbursed.

67.     When the State and/or a federal or State-funded insurance program audits Connections' records, they conduct two separate audits: one audit of the particular clinic's clinical records, and another audit of the claims for reimbursement for services provided to Medicare and Medicaid recipients submitted by each clinic.  Ms. Spruill has witnessed such audits taking place.  Based on her observation, these two audits are never conducted simultaneously or in coordination with one another such that clinical and financial or billing records would be compared against one another.  If Connections' clinical records were audited at the same time as, and in coordination with, the clinics' claims for reimbursement for services provided to Medicare and Medicaid recipients, then the auditors would see that the

providers providing the services (and entering the information into EHR) are not the same providers who are listed as the rendering providers on the claims submitted for payment.  This practice goes undetected because this additional step is not customarily taken in auditing procedures.  However, the necessary data to conduct such a comparison is available in Connections' electronic files.

68.     Specific, claim-level violations of the FCA and the DFCRA may be identified with precision by comparing a Connections clinic's claims for reimbursement for Medicare and Medicaid services on a specific date to that clinic's corresponding clinical records.

69.     Specifically, with respect to clinics where Ms. Spruill never worked or supervised any individuals working at those clinics, violations of the FCA and the DFCRA can be identified by comparing the claims for reimbursement submitted to Medicare or Medicaid for reimbursement by or on behalf of these clinics reflecting Ms. Spruill's NPI with the corresponding clinical records showing the actual employee who provided the services and entered the information into EHR.  This analysis will show neither Ms. Spruill nor anyone she supervised provided these services.  Such claims are false.

70.     Similarly, with respect to clinics where Ms. Spruill worked or supervised individuals working at these clinics during discrete periods of time,

violations of the FCA and the DFCRA can be identified by comparing claims for reimbursement submitted to Medicare and Medicaid by or on behalf of these clinics reflecting Ms. Spruill's NPI during the periods when Ms. Spruill neither worked nor supervised anyone at these clinics with the corresponding clinical records showing the actual employee who provided the services and entered the information into EHR. This analysis will show neither Ms. Spruill nor anyone she supervised provided these services. Such claims are false.

**B.    Malika Spruill.**

71.    Ms. Spruill has been a LCSW since 2010.

72.    A LCSW who furnishes, bills, or receives payment for health care in the normal course of business, and sends covered transactions electronically, must obtain an NPI. An NPI is a unique 10-digit numeric identifier for covered health care providers, created to improve the efficiency and effectiveness of electronic transmission of health information. LCSWs, as covered health care providers, must use NPIs in their administrative and financial transactions.

73.    Ms. Spruill's NPI is 1811205909.

74.    On or about August 26, 2013, Connections hired Ms. Spruill as a LCSW in its Newark Clinic. When Ms. Spruill was hired, she was the only LCSW at the Newark clinic. From August 26, 2013 until October 6, 2014,

while Ms. Spruill was in the Newark Clinic, she was a Therapist.  She was not a supervisor.

75.    Prior to Connections hiring Ms. Spruill, the staff at the Newark Clinic was instructed to select Katherine Clendening ("Clendening"), a LCSW who worked as a therapist in the Millsboro clinic, as the "bill to" person in EHR for work performed at the Newark clinic.  Clendening never served as a clinical supervisor at any Connections clinic, let alone the Newark clinic.

76.    After Connections hired Ms. Spruill, the staff at the Newark Clinic was instructed – without Ms. Spruill's knowledge or permission – to select Ms. Spruill's name as the "bill to" person from the drop-down menu for services provided in the Newark Clinic.  Therefore, services performed by non-credentialed, unlicensed, and unsupervised providers in the Newark clinic were billed to Medicare and/or Medicaid as if Ms. Spruill provided them, when she neither provided nor supervised these services.

77.    By selecting Clendening, and later Ms. Spruill, as the "bill to" person when neither Clendening nor Ms. Spruill provided these services or supervised the provision of these services, Connections caused to be submitted, and submitted, claims for covered services to federal and State-funded insurance programs falsely indicating a LCSW provided these services

(or supervised the provision of these services). Connections was reimbursed, and continues to be reimbursed, for such services as if a LCSW provided or supervised them. In reality, however, non-credentialed, unlicensed, and unsupervised providers who are not entitled to any reimbursement from Medicare and Medicaid provided these services.

78.     In 2014, a co-worker informed Ms. Spruill that other counselors were using Ms. Spruill as the "bill to" person, although Ms. Spruill was not a supervisor. Upon learning this, Ms. Spruill emailed Ms. Vinny Hickman ("Hickman"), the Director of Human Resources and Assistant to General Counsel at Connections, to find out why counselors she was not supervising were using her as the "bill to" person when she was not a supervisor and not supervising them.

79.     On or about September 12, 2014, Ms. Spruill emailed Hickman in Connections' Human Resources department, to find out whether persons at Connections were using her NPI when submitting claims for reimbursement to the Government and/or the State of Delaware.

80.     On or about October 3, 2014, approximately three weeks after emailing Hickman inquiring if someone was billing under her NPI, Connections terminated Ms. Spruill without responding to her concerns regarding Connections' "bill to" practice.

81.    In or about August 2015, Ms. Spruill was re-hired by Connections as a Clinical Supervisor.

82.    According to Connections' written materials, a Clinical Supervisor "is responsible for providing clinical direction to an assigned group of programs that offer short to intermediate term integrated medical, mental health and alcohol and other drug treatment services (including MAT and DUI treatment) in community-based treatment centers located throughout Delaware."   A Clinical Supervisor's principal duties and responsibilities include "supervis[ing] all clinical activities of assigned counselors," "provid[ing] supervision to clinical staff, interns and others regarding cases which are 'billed under' his/her license."[2]

83.    In her capacity as Clinical Supervisor, for approximately three months (August 2015 to November 2015), Ms. Spruill rotated between the Wilmington, Dover and Smyrna Clinics.  During these three months, services performed by non-credentialed providers in the Wilmington, Dover and Smyrna clinics were billed to Medicaid using Ms. Spruill's NPI because Ms. Spruill was supervising these staff members.

---

[2] **Ex. 2** (Connections CSP, Inc. Job Description Clinical Supervisor in the Integrated Outpatient Services Department).

84.    In or about August 2015 until approximately November 2015, Connections only had three LCSWs for all of its clinics:  Schneck in the Newark Clinic, Clendening in the Millsboro Clinic, and Ms. Spruill, who split her time between the Wilmington, Dover and Smyrna Clinics for approximately three months until she was moved to the Dover clinic.  During this time, Frank Everette ("Everette"), a LPCMH who worked in the Dover clinic as a therapist, and was the only other licensed person in that clinic (other than Ms. Spruill) was used as the "bill to" person in Dover, and his NPI was also used on group notes.  Everette did not provide the services to the clients, and he was not a supervisor. Ms. Spruill's suggestion that Everette become a supervisor was rejected.   Therefore, during the August 2015 through November 2015 timeframe, services performed by non-credentialed and unsupervised providers in Connections' clinics not supervised by Ms. Spruill, Schneck, Clendening and/or Everette were billed to Medicare and/or Medicaid as if Ms. Spruill, Schneck, Clendening and/or Everette provided them and/or supervised these services when they did not.

85.    Connections' medical records show that non-credentialed and unsupervised providers in Connections' clinics billed to Medicare and Medicaid as if Ms. Spruill, Schneck, Clendening and Everette provided these services and/or supervised the services.

86.     In or about August 2015, the Wilmington clinic was run by Lisa Shafer ("Shafer"), a LPCMH.  No LCSWs worked in the Wilmington clinic at this time.

87.     Connections was not – and is not – entitled to reimbursement by Medicare for clients seen by non-LCSW providers.  Ms. Spruill did not provide services to any of Connections' Medicare clients receiving MAT services.   Thus, Connections was not entitled to reimbursement from Medicare for any claims submitted for services performed, *inter alia*, in the Harrington clinic, or in the Wilmington clinic while Ms. Spruill was supervising Schafer, a LCPMH, Teresa Sharpe ("Sharpe"), a MSW and another MSW.

88.     Eventually, Kyle Vansant ("Vansant"), a LCSW, was hired as a therapist – but not as a clinical supervisor – of the Wilmington clinic.

89.     In or about August or September 2017, Connections hired Lakeeya Thornton ("Thornton"), a LCSW, as the clinical supervisor, and Jamy Rivera ("Rivera"), a LCSW, as the Director of the Wilmington clinic.

90.     Beginning in approximately November 2015 through August 10, 2017, Ms. Spruill was moved to the Dover clinic, where she continued in her role as Clinical Supervisor.

91.    In or about November 2016, Ms. Spruill was no longer supervising the Smyrna clinic after Rick Thomas ("Thomas") was hired. Discovery is required to show exactly when employees at the Smyrna clinic stopped using Ms. Spruill's NPI as the "bill to" person in the Dover clinic, as Ms. Spruill cannot independently confirm when this occurred.

92.    In February 2016, Caroline Showell ("Showell"), a LCSW, was hired as a clinical supervisor for the Millsboro clinic. Showell became the "bill to" person for the Millsboro clinic, and Connections' satellite site, Longneck Outpatient.

93.    When Deborah Pringle ("Pringle") was promoted from Director of the Millsboro clinic to Connections' Director of Nursing, Showell was promoted from clinical supervisor Director of the Millsboro clinic.

94.    In or about July 2017, Showell left Connections.

95.    For approximately two months prior to Showell's replacement being hired, Ms. Spruill assisted at the Millsboro clinic.

96.    After Showell's departure, Cropper, the then-Director of the Dover clinic became the interim Director of the Millsboro clinic. Cropper had a Bachelor's degree, and was a CADC. In or about August or September 2017, Cropper became the Director of the Millsboro clinic, and Ms. Spruill was promoted to Director of the Dover clinic.

97.     Following the two-month period when Ms. Spruill assisted in the Millsboro clinic, and after Cropper took over, Connections' employees and agents were instructed to use Ms. Spruill as the "bill to" person for the Millsboro Clinic, despite Ms. Spruill not working at, or supervising the provision of services in the Millsboro Clinic during this time. Thus, services performed by non-credentialed, unlicensed, and unsupervised providers in the Millsboro clinic were billed to Medicare and/or Medicaid as if Ms. Spruill provided them, when she neither provided nor supervised these services.

98.     To be clear, Ms. Spruill has never seen clients at the Millsboro clinic, and only supervised individuals at the Millsboro clinic for a two-month period prior to Showell's replacement being hired.

99.     Thus, from approximately November 2015 through August or September 2017, services performed by non-credentialed and unsupervised providers in the Wilmington clinic were billed to Medicare and/or Medicaid as if Ms. Spruill provided them or supervised these services when she did not.

100.    From approximately November 2015 through February 2016, and from in or about July 2017 to in or about August-September 2017, services performed by non-credentialed and unsupervised providers in the Millsboro clinic were billed to Medicare and/or Medicaid.

101.   When Ms. Spruill saw the Health Options' Statement of Provider Claims for the Harrington Clinic, she learned Lashonda (Johnson) Crawford ("Crawford"), an unlicensed counselor, was using Ms. Spruill's NPI when she was working at Connections' Harrington clinic.  When Crawford used Ms. Spruill's NPI, Ms. Spruill was not supervising Crawford, nor did Ms. Spruill have any role in providing the services billed under her NPI by Crawford. Crawford's use of Ms. Spruill's NPI violated the requirement that a licensed practitioner be on site and supervising unlicensed staff.

102.   Effective August 11, 2017, Ms. Spruill's title changed to "Clinical Supervisor/Regional Director of Kent & Sussex County."[3] According to Connections' written materials, a "Clinical Supervisor" "will manage a program site and will deliver direct services to individuals with substance use disorders or co-occurring substance abuse and mental health conditions.  This person will manage the internal relationships needed to make the program run effectively."  The principal duties and responsibilities of the Clinical Supervisor include, *inter alia*, "[p]rovid[ing] clinical supervision to ensure[] that all treatment plan reviews are conducted in accordance with regulatory requirements;" "[m]eet[ing] at least twice weekly with Counselor 2

---

[3] **Ex. 3** (Amended Offer Letter); **Ex. 4** (Employee Action Form).

positions for clinical supervision;" "complet[ing] document review, co-sign[ing] documents, provid[ing] assessment and feedback of counselor 2's performance," "[p]rovid[ing] clinical supervision to assure that assessments and treatment plans are completed on a timely basis," and "perform[] other duties as requested or assigned, verbally or in writing."[4]

103.   Ms. Spruill was only briefly a regional director before her title was changed again to clinical supervisor.

104.   Effective January 18, 2018, Ms. Spruill's title changed to "Site Manager of the Dover AOD Program."[5]

105.   In April or May 2018, Ms. Spruill asked her supervisor Pringle, then the director of Connections' southern Delaware region, which included the Dover, Millsboro and Seaford clinics, if she was aware of who, if anyone, at Connections was choosing her as the "bill to" person within EHR, thus causing Ms. Spruill to be listed as the rendering provider on the claims submitted for payment to the Government and/or Delaware.  Ms. Spruill also asked Pringle who the new "bill to" person was going to be after Showell's

---

[4]   **Ex. 5** (Connections CSP, Inc. Job Description "Clinical Supervisor/Site Manager – AOD Services, Program Operations.

[5] **Ex. 6** (Amended Offer Letter).

then-recent departure from the Millsboro Clinic.  In response, Pringle told Ms. Spruill that Connections was using a LPCMH as the "bill to person."

106.   In May 2018, without explanation, Pringle informed Ms. Spruill she was hiring two additional LCSWs.

107.   In or about May 2018, Ms. Spruill called Health Options to ask about the use of her NPI by individuals other than herself.  Health Options refused to provide Ms. Spruill with any information regarding the use of her NPI by others.

108.   In April or May 2018, Relator Douglas Spruill ("Mr. Spruill"), Ms. Spruill's husband – who was the Site Director at the Harrington clinic until June 10, 2019 (as discussed in more detail below) – received several re-submitted claims directly from Health Options.  Mr. Spruill noticed that Ms. Spruill's NPI was listed as the "Rendering Provider" on these claims for services provided at the Harrington clinic.  Thus, any claims submitted to Medicaid and Medicare were submitted under Ms. Spruill's NPI.

109.   Ms. Spruill has never seen clients at the Harrington clinic, did not provide the services reflected on these claims for services, and never supervised anyone providing services to clients at the Harrington clinic.  Yet, Ms. Spruill is the only designated "bill to" person for all services provided at the Harrington clinic.

110.   On or about June 1, 2018, McKay requested a meeting with Ms. Spruill and Connections' Human Resources department.

111.   On or about June 4, 2018, Ms. Spruill's physician recommended she take the remainder of the week off because her blood pressure was extremely high.  Ms. Spruill worked a full day on June 5, 2018 to complete the previously scheduled appointments on her calendar.  She began medical leave on June 6, 2018.

112.   On or about June 7, 2018, McKay requested a meeting with Ms. Spruill without providing her any information about the purpose of the meeting.  Despite being out sick, Ms. Spruill met McKay in Wilmington, Delaware.  At this meeting, McKay and Pringle, Steven Davis and Deb Crosson initially told Ms. Spruill she was being demoted to a therapist position in Wilmington.  Ms. Spruill was not comfortable in that position. Later, McKay offered Ms. Spruill the Clinical Supervisor position where she provided "clinical chart supervision" over Connections' employees from a remote Middletown location.

113.   Prior to the June 7 meeting, McKay became aggressive and hostile towards Ms. Spruill.  For example, McKay was very short-tempered with Ms. Spruill in meetings, and at times, would not speak to her.  McKay also claimed Ms. Spruill was consistently angry, which Ms. Spruill disputes.

114.    On or about June 8, 2018, Hicks emailed Julie Morris ("Morris"),
Mr. Spruill and Pringle stating that individuals should bill under the
supervisor from their clinic.

115.    On June 11, 2018, Ms. Spruill sent Crosson her doctor's note
extending her medical leave.  On June 13, 2018, while Ms. Spruill was still
on leave, Ms. Crosson asked Ms. Spruill if she had decided to take the LCSW
position in Wilmington.   On the same day, Ms. Spruill emailed Chris
Devaney, expressing her frustration over "being forced into a position" and
"being demoted to a therapist; [n]ot even a clinical supervisor" despite never
being written up.

116.    Ms. Spruill's NPI has been used in claims for services provided
at multiple Connections' clinics at which she has never worked nor supervised
providers at these sites, including at a minimum, the Harrington clinic.
Specifically, and by way of example only, Ms. Spruill was listed as the "bill
to" person on the following Health Options' Statement of Provider Claims for
the Harrington Clinic:

| Claim # | Dates of Service | Rendering Provider ID | Sub Prod Svc/Mod | Charge | Clm Adj Amt | Clm Payment |
|---|---|---|---|---|---|---|
| 20581288513 | 09/27/17-09/27/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20581288514 | 09/27/17-09/27/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20581288516 | 09/27/17-09/27/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20581288524 | 10/25/17-10/25/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20581288525 | 10/25/17-10/25/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20581288527 | 10/25/17-10/25/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20581288530 | 10/27/17-10/27/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20581288531 | 10/27/17-10/27/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20681727250 | 12/01/17-12/01/17 | 1811205909 | 90834 | $95.00 | $95.00 | $0.00 |
| 20581287912 | 11/03/17-11/03/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20581288056 | 11/10/17-11/10/17 | 1811205909 | 90832 | $78.00 | $78.00 | $0.00 |
| 20581288058 | 11/13/17-11/13/17 | 1811205909 | 90834 | $95.00 | $95.00 | $0.00 |
| 20581288631 | 11/30/17-11/30/17 | 1811205909 | 90832 | $78.00 | $78.00 | $0.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 20581288704 | 12/05/17-12/05/17 | 1811205909 | 90834 | $95.00 | $95.00 | $0.00 |
| 20581288978 | 12/13/17-12/13/17 | 1811205909 | 90834 | $95.00 | $95.00 | $0.00 |
| 20781469173 | 11/01/17-11/01/17 | 1811205909 | H0015 HQ | $115.00 | $115.00 | $0.00 |
| 20781469174 | 11/01/17-11/01/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20781469205 | 11/03/17-11/03/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20781469206 | 11/03/17-11/03/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20781469260 | 11/06/17-11/06/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |
| 20581287923 | 11/02/17-11/02/17 | 1811205909 | 90853 | $40.00 | $40.00 | $0.00 |

117.   Ms. Spruill has documentary evidence of approximately 651 examples of her NPI being used improperly at the Harrington clinic on Health Options' February 2, 2018 Statement of Provider Claims Paid for the Harrington clinic.

118.   Ms. Spruill's NPI has been used in claims for services provided at multiple Connections' locations at which she has worked previously, but she was not working at (or supervising individuals working at) these locations

when the claims using her NPI were submitted for payment, including at a minimum, at the Smyrna, Millsboro and Wilmington Clinics.

119. Through her conversations with Connections employees, including but not limited to Cropper, Walker, Lezley Sexton ("Sexton"), Heather Emerick ("Emerick") and Hicks, Ms. Spruill learned counselors and other lower-credentialed (or non-credentialed) providers who she was not supervising were instructed to select her name as the "bill to" person in EHR.

120. Effective July 26, 2018, Ms. Spruill's title changed to "Clinical Supervisor of the Dover AOD Program."[6]

121. On or about July 30, 2018, Ms. Spruill returned from medical leave to her demoted position in the Middletown facility.

122. As of August 2018, Connections had approximately eleven (11) LCSWs working in its Outpatient Clinics: Schneck; Erin Cliffe ("Cliffe"); and Robert Riddler ("Riddler") in its Newark clinic; Thomas in its Smyrna clinic; Rivera and Thornton in its Wilmington clinic; Julie Morris ("Morris"), who started in or about September 2017 part-time in its Harrington clinic, two LCSWs in its Millsboro clinic, including Gail Quennville, and Ms. Spruill and Lisa Clark ("Clark"), also a LCSW in its Dover clinic.

---

[6] **Ex. 7** (Amended Offer Letter).

123.   In November 2018, less than seven months after Ms. Spruill asking her supervisor who was using her NPI, and Ms. Spruill calling Health Options to get the same information, and less than five months after Defendants demoted Ms. Spruill for such inquiries, Defendants took the ultimate act of retaliation, and terminated Ms. Spruill.

## C.     Dr. Akinlawon Olugbenga Ayeni.

124.   Dr. Ayeni, an Addiction Medicine specialist, is an employee or agent of Connections, who practices telemedicine.  His NPI is 1821167149.

125.   CMS requires, as a condition of payment, physicians providing telemedicine "to use an interactive audio and video telecommunications system that permits real-time communication between you, at the distant site, and the beneficiary, at the originating site."[7]

126.   Connections has used Dr. Ayeni's NPI on thousands (the exact number to be determined in discovery) of claims related to services provided to clients in its Women's Residential Program, and other clinics, for which he did not interact with the clients, nor supervise the unlicensed providers who

---

[7] CMS Medicare Learning Network Booklet re: Telehealth Services at 4 (ICN 901705, Feb. 2018), available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/TelehealthSrvcsfctsht.pdf.

interacted with the clients, including services for which Connections billed federal and/or state-funded insurance programs as if he provided or supervised such services. Specifically, and by way of example only, Dr. Ayeni was listed as the "bill to" person on the following Health Options' Statement of Provider Claims for the Harrington Clinic:

| Claim # | Dates of Service | Rendering Provider ID | Sub Prod Svc/Mod | Charge | Clm Adj Amt | Clm Payment |
|---|---|---|---|---|---|---|
| 20091790466 | 12/13/17-12/13/17 | 1821167149 | H0048 HF | $25.00 | $25.00 | $0.00 |
| 20881565803 | 11/09/17-11/09/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881565808 | 11/10/17-11/10/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881565818 | 11/11/17-11/11/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881565830 | 11/12/17-11/12/17 | 1821167149 | H0020 | $15.00 | $11.00 | $0400 |
| 20881565860 | 11/14/17-11/14/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881565904 | 11/17/17-11/17/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881565917 | 11/18/17-11/18-17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881566119 | 10/22/17-10/22/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881566120 | 10/23/17-10/23/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881566124 | 10/26/17-10/26/17 | 1821167149 | H0020 | $15.00 | $11.00 | $0.00 |
| 20881566126 | 10/28/17-10/28/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881566131 | 11/20/17-11/20/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |

| Claim # | Dates of Service | Rendering Provider ID | Sub Prod Svc/Mod | Charge | Clm Adj Amt | Clm Payment |
|---|---|---|---|---|---|---|
| 208811566241 | 11/21/17-11/21/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881566247 | 11/22/17-11/22/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881566266 | 11/24/17-11/24/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881566297 | 11/26/17-11/26-17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881566319 | 11/27/17-11/27/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881566354 | 11/30/17-11/30/17 | 1821167149 | H0048 | $25.00 | $25.00 | $0.00 |
| 20881565686 | 11/01/17-11/01/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |
| 20881565717 | 11/03/17-11/03/17 | 1821167149 | H0020 | $15.00 | $11.00 | $4.00 |

127. In addition, and by way of example only, Ms. Spruill has documentary evidence of approximately 971 examples of Dr. Ayeni's NPI being used as the "bill to" person on Health Options' February 2, 2018 Statement of Provider Claims Paid for the Harrington clinic.

128. Dr. Ayeni neither directed nor inspected the work, actions, or performance of, nor oversaw the work of the Connections' employees and/or agents who used his NPI, as described herein.

### D. Fabrication of Medical Records.

129. On or about November 11, 2015, Diveadra Harmon ("Harmon"), EHR Support and Clinical Technician at Connections, informed Hicks that

Dr. Ayeni, Dr. Adaeze Udezue ("Dr. Udezue") and Dr. Scott Houser ("Dr. Houser") had missing and unsigned documents in the EHR.

130.   Specifically, as of the review on November 9, 2015, Dr. Ayeni had fifty (50) unsigned documents related to MAT clients from the Newark and Dover clinics, twenty-nine (29) unsigned documents related to methadone/buprenorphine clients from the Newark clinic, and fifteen (15) other unsigned notes related to, *inter alia*, admissions for buprenorphine, admissions for methadone, biopsychosocial assessment, and MAT CPE from the Newark and Dover clinics for clients he had seen as far back as February 2015.

131.   As of November 9, 2015, Dr. Udezue, a substance abuse/MAT doctor at Connections, had, *inter alia*, not signed nine evaluation for methadone/buprenorphine notes, two progress notes, eight physician progress notes, two medical physician progress notes, one MAT CPE, two admission notes for methadone and four admission notes for buprenorphine for clients she had seen as far back as September 2, 2015 in the Millsboro clinic.

132.   As of November 9, 2015, Dr. Houser, a psychiatrist at Connections, had, *inter alia*, twenty-four (24) MAT service documents missing for patents he had seen as far back as March 23, 2015; twenty-four (24) missing Methadone/suboxone evaluations that CareLogic did not locate

for patents he had seen as far back as November 21, 2014; fifty-two (52) physician progress notes missing for patients he had seen as far back as March 24, 2015; and fifteen (15) missing medical physician progress notes for patients he had seen as far back as November 10, 2014 at the Newark clinic.

133.   In 2017, Dr. Ayeni had over 500 unfinished medical records in the CareLogic software program.

134.   Mr. Spruill noticed Dr. Ayeni's records were incomplete. Thereafter, Mr. Spruill noticed these records had been completed.

135.   Dr. Ayeni did not complete these records himself.   Instead, Pringle, who had administrative access to CareLogic (prior to her termination from Connections on or about June 7, 2018), completed these records on Dr. Ayeni's behalf.

136.   Pringle did not consult with Dr. Ayeni to obtain the facts relevant to the clients' care, nor did she have any notes relevant to these clients' care on the dates of service in question.   Instead, Pringle fabricated Dr. Ayeni's incomplete records to make it look like they were complete and services were provided by Dr. Ayeni.

137.   The records Pringle fabricated inaccurately describe the services provided and the clients' conditions.

138.    Karen Hanson Saroglia ("Saroglia") was also required to login to CareLogic using Dr. Ayeni's login credentials and fabricate over 1,400 of Dr. Ayeni's unfinished records.

139.    Saroglia did not consult with Dr. Ayeni to obtain the facts relevant to the clients' care, nor did she have any notes relevant to these clients' care on the dates of service in question.  Instead, Saroglia fabricated Dr. Ayeni's incomplete records to make it look like they were complete and services were provided by Dr. Ayeni.

140.    Dr. Somasunderman Padmalinggam ("Dr. Padmalinggam") is a family practitioner, who worked at several of Connections' clinics, including the Smyrna, Dover and Harrington clinics.

141.    On or about August 30, 2017, Dr. Padmalinggam was terminated from Connections and escorted from the building.

142.    When he was terminated, Dr. Padmalinggam had not completed his records in CareLogic.

143.    Approximately two weeks after Dr. Padmalinggam was terminated, Ms. Spruill noticed Dr. Padmalinggam records had been completed.

144.   Dr. Padmalinggam could not have completed these records himself because these records were incomplete when he was terminated from Connections and escorted from the building.

145.   Doctors working at Connections were not the only Connections' personnel whose records were falsified, or who failed to complete the required paperwork.

146.   As Ms. Spruill explained on or around October 26, 2015:

> Did you speak with [redacted] on Friday and do you feel that he understood what was expected from him?   I'm asking because he submitted several recovery plans and although I said I would not un sign them, some of them I have to.   **He has a recovery plan that was due in August that he just did in today, however he left gaps in treatment**.   I'm trying to allow him to complete work, but **I will not sign work that is completely wrong and could cause issues with an audit**. ☹ (emphasis added).

147.   Connections recordkeeping is so horrendous that, in at least one instance, one client's information was scanned into another client's chart causing Schneck to flag the second client's chart as missing a transfer summary.

148.   In another example, on or around August 30, 2018, Cliffe asked Ms. Spruill to sign off on a record in which Cliffe wrote "Treat for Diabetes and Spinal Fusion" when the underlying record clearly stated "refer to a specialist." As Ms. Spruill told Cliffe before sending the record back to Cliffe:

I am very sorry, but I am no longer going to be able to sign things that I can't clinically stand by. **When I sign my name, it is saying that I agree with what is written and in some instances, that is not correct.** I am sending back RB (11068). I believe we can monitor her medical condition without actually stating that we are going to treat it. **If we were treating her Diabetes, than yes. A spinal fusion, I am not sure about that and how we can go about treating that. The fact that she states that we are referring to a specialist and then says Treat is very contradicting.** However, if you are comfortable with it, then I think you should be the one who signs it. (emphasis added).

149. Following her exchange with Cliffe, Ms. Spruill told Baker:

I am not comfortable signing some of the stuff that they say. I am not signing something that Erin [Cliffe] says Treat for Diabetes and Spinal Fusion when it clearly states that it says refer to a specialist.

150. On or about May 8, 2017, McKay was informed her employees were, *inter alia*, being asked to "fraudulently sign[] documents and/or add[] unknown milligrams of medications on documents," and "violat[ing] HIPPA."

151. While Connections routinely fabricated medical records, during the period leading up to external audits, Connections rushed to complete its documentation regardless of whether the final documents had any relation to the actual services or treatment provided. By way of example only, on or about January 23, 2013, Chris Devaney, Connections' Chief Operating Officer, flagged several documentation issues noting: "This is not

good…either documentation is not complete or people aren't working.  This needs to improve by the end of the week."

152.   More than a year later, on or about June 2, 2014, the documentation problem persisted at Connections.   As Anna Harmon explained to the ACT1 Newark team:

Status of Documentation (This is not good!)
================================
- 70 Crisis Plans are not done
- 50 Re-Certs that are not done
- 76 Assessment Summaries are not done
- 73 Treatment Plans are not done
- 32 ASI's are not done
- Only 3 Community Living Questionnaire
- No Monthly Summaries (from January  to June)

153.   Connections knew its shoddy recordkeeping was "a violation of HIPPA" and it would be in "MAJOR trouble" if the State did "a pop up audit" and saw these charts "scattered across the floors and around the desks" and "under desks, on the floor, in drawers, etc."  As Chanda Gibson ("Gibson"), the Performance Improvement Coordinator for the ACT Teams warned:

In reference to charts and the chart room.

- ALL CHARTS MUST BE PUT AWAY EACH NIGHT IN THE CHART ROOM. There can be NO charts in offices (private or not), under desks, on the floor, in drawers, etc. This is a violation of HIPPA.
- Charts must be LOCKED away EVERY DAY when the staff is gone. In the chart room ALL file cabinets must be CLOSED and cannot be open at any time.
- If a chart is used, please put the chart away once you are finished with a chart.

In RESPECT for those that file, (QA & PA) if a chart is not in the chart room, we cannot file. We are trying to keep paperwork down but charts are missing. If the states does a pop up audit and they see charts we will be in MAJOR trouble. There are CONTRACT STANDARDS for confidential chart compliance and there are some teams in major violation. There have been times where we could not find a chart. In a case of an emergency we cannot go searching for charts. Most of you are already gone and will not see this until tomorrow so once you come in… PUT THE CHARTS AWAY. For the confidentiality of the consumers, the case of work on those who file, and the compliance of standards. If you see a chart… PUT IT AWAY! Let someone get mad it was moved. Charts are not supposed to be left out.

154. Not only did Connections' records fail to comply with the applicable regulations, but its personnel lacked the required training and certifications required to comply with DSAMH's requirements and other applicable regulations.

155. In February 2016, in advance of Dover's DSAMH outpatient audit, McKay was "worried about Smyrna and Dover where there [was] no site manager." Thus, McKay scheduled time to talk with Ms. Spruill, Cropper and Heather Emrick ("Emrick") about the impending audits.

156. On or about April 15, 2016, with the Smyrna clinic's audit fast approaching, McKay decided to "make chart auditing for them a priority" and wanted to "talk about … what we can do to make sure that their audit is as good as it can be?"

157.   In advance of the audits on the files for Clint Walker, Blackbird Landing, Gordy Place, West Street Commons, Connections emailed a "list of individuals that are in need of various documents.…" and urged the recipients to send the documents promptly.

158.   On or about August 18, 2018, after having looked again at the status of the clinical supervision in Dover, McKay was "really worried that there [were] hundreds of unsigned documents. … **The ones that worry me the most are the recovery plans, which are clearly out of compliance**." (emphasis added).

159.   On or about February 7, 2017, McKay recognized "[a]ll of a sudden, DSAMH is coming fast and furious to audit" and called on her staff to "make it a priority to get ready."

160.   By April 17, 2017, McKay began to panic about the audit of the Dover clinic, and directed her staff to blindly sign unsigned documents. Specifically, she told Cropper and Ms. Spruill:

## Dover audit

| | |
|---|---|
| **From:** | Cathy McKay <cmckay@connectionscsp.org> |
| **To:** | Alex Cropper <acropper@connectionscsp.org>, Malika McMeans-Spruill <mmcmeans-spruill@connectionscsp.org> |
| **Date:** | Mon, 17 Apr 2017 19:08:41 -0400 |

I am really worried about the large number of unsigned documents in the Dover clinic. I am sure that the audit is not far away. I need you to just start signing them. I know they are not all correct, but if you have other documentation of clinical supervision, I still think you can sign them. Otherwise they are not going to be seen as there at all.

161.   In 2018, the Dover clinic's records were no better than they were the year prior forcing Ms. Spruill to email the Dover AOD team:

## Charts

| | |
|---|---|
| From: | mmcmeans-spruill@connectionscsp.org |
| To: | Dover AOD <doveraod@connectionscsp.org> |
| Date: | Thu, 07 Jun 2018 15:01:59 -0400 |

It has been brought to the attention of the CEO, that Dover's records look bad and are not audit ready! This is a problem since it has been discussed daily. No time off will be permitted if your charts are incomplete! It is never good when Dover looks bad as a unit! If you need help, please ask for it!

Thank you,

Malika

162.   Prior to the 2018 audit, the Harrington clinic's documents continued to be in a state of disarray.  When Anthony Davis selected fifteen of his most compliant files for the audit, two of them were "not a good choice for an active or discharge client," one because his "Front Desk Consents were not completed at the time of intake on 5.18.18, but 27 days later on 6.13.18" and the other because his Front Desk Intakes "were not completed at the time of intake on 6.14.19 but 29 days later on 7.12.18."

163.   In August 2018, Connections was still "trying to get ready for CARF and DSAMH" and had "a lot of med checks that [were] past due."

164.   On or about October 2, 2018, Mr. Spruill notified Chris DeVaney and Lamont Baker that the Harrington clinic did not have a full-time nurse practitioner and would be out of compliance.  Mr. Spruill also told Chris

63

DeVaney and Baker that the Harrington clinic was "not in compliance for the fast track 23s CPEs, MH appts and IOP sick calls."

165.   On or about April 12, 2019, Glenn LeFevre, a Senior SUD Treatment Administrator, sent Mr. Spruill an updated job description for the "Site Manager" position and an updated agreement that added substantial additional responsibilities to his position, in addition to his current responsibilities, and drastically modified his schedule.   As Mr. Spruill explained in his April 15, 2019 response, Connections was retaliating against him for revealing its "fraudulent billing practices" and that the "levels of care at HWMC" failed to meet the standards for regulatory compliance, and these documents were "punitive" and "without justification."

166.   As of June 10, 2019 when Connections improperly terminated Mr. Spruill, the Harrington clinic still failed to comply with the requirements for the "fast track" program's CPE's, mental health appointments and IOP sick calls.

### E.   Medically Unnecessary Intake Sessions.

167.   The Manual provides for Connections to be reimbursed at predetermined rates for providing specific, medically-necessary alcohol and drug treatment services.

168.   All of Connections' new clients are required to participate in an intake session.  During the intake session, Connections determines the level of services that each client should receive.

169.   All Connections facilities conduct intake sessions, however, only the Harrington clinic offers intake services twenty-four hours a day, seven days a week.

170.   Harrington is also the only clinic that offers up to twenty-three hours of continuous observation, monitoring, and support in a supervised environment for individuals initially recovering from the effects of alcohol and/or other drugs, *i.e.* the "23-hour program."

171.   After clients who are receiving medication-assisted therapy ("MAT") services for opioid addiction miss three consecutive days of dosing, they are required to speak with a physician.  Rather than allowing clients to speak with an on-call physician, Connections requires clients to submit to another intake.  If the client presents to a clinic that is not offering an intake session that day, Connections arranges for the client to be transported to the Harrington clinic.  Once at the Harrington clinic, the client is subjected to another intake and admitted into the 23-hour program.  Connections refers to this as its "fast track" program.

172.   Connections "fast tracks" clients every day at its Harrington clinic.  Its policy is to "fast track" as many clients as possible, regardless of the client's medical needs, so Connections can receive the per diem reimbursement rate of $334.27 (Code H0012) for each client.

173.   Connections effectively treats all clients sent to the Harrington clinic for an intake as new clients, even though they may have been actively treating with Connections for an extended period of time, and only recently missed three consecutive days of dosing, so it may bill Medicare, Medicaid and/or DSAMH for a new assessment.

174.   If clients refuse to participate in the additional intake, Connections refuses to dose him/her.

175.   After the "fast track" program, clients are returned to the clinic that referred them to Harrington.  Then, that clinic provides the same services as Harrington provided in the "fast track" program.

176.   Mr. Spruill has discussed the "fast track" program with Dr. Henry Luu ("Dr. Luu"), a provider of telemedicine services at Connections. Mr. Spruill and Dr. Luu have also discussed the procedure that should be followed when a client misses dosing sessions, *i.e.* meeting with a physician and then resuming his/her dosing program.

177.   When Connections seeks reimbursement for clients in its "fast track" program, it is reimbursed for 23-hours of services, even if it provides only four hours of services.

178.   Connections rarely provides more than four hours of services to its clients in the "fast track" program regardless of the client's medical needs. Mr. Spruill estimates that less than 25% of Connections' "fast track" clients receive 23-hours of services.

179.   Some of the clients who received intake assessments at the Harrington facility were referred to Connections by Christiana Care Health Systems ("Christiana Care").   Christiana Care and Connections collaborated together to implement a program known as Project Engage whereby Christiana Care hospitals referred substance abuse patients to Connections. Upon receiving referrals, Connections tracks these referrals internally as being referred from Christiana Care.

180.   Connections' policy, as required by McKay and Baker, was that all Project Engage referrals had to be accepted regardless of whether Connections' employee thought the client could be properly treated at the clinic.   By way of example, one specific Project Engage referral had a high BAC.   Connections' Harrington staff did not want to accept the client, and in response, McKay indicated that all referrals were to be accepted.   McKay also

required a record to be kept and reported to her daily if any clients from Christiana Care were sent back to the hospital.

**F.     Manipulation of Length of Services Provided to Meet Arbitrary Billing Targets.**

181.   CareLogic places a timestamp on every activity entered into the system.  As Emrick warned: "Length of client sessions- Carelogic puts time stamps on every activity we check-in/check-out.  This means if we are billing for a 1-hour session, the client needs to be in our offices for a minimum of 45 minutes."

182.   Nevertheless, Connections billed Medicare, Medicaid and DSAMH for the maximum time allowed for each service regardless of whether Connections actually saw the client for that length of time.

183.   Connections also began double-booking its providers for, *inter alia*, mental health appointments and intakes.

184.   After Shockley questioned the Dover clinic's practice of scheduling its clients during the Harrington clinic's allotted appointments with Dr. Luu, on or about August 30, 2018, Johanna Johnson explained:

On Aug 30, 2018, at 7:49 PM, Johanna Johnson <jjohnson1@connectionscsp.org> wrote:

Hi Christina,

Well this particular day of 9/20/18, we have just Suboxone clients scheduled due to Dr. Luu having to be at KGH in the late morning. So, I can certainly move these clients down. Dover tries to schedule med checks past 10a  as we know Dr.Luu sees Harrington first, but with the amount of transfers, med checks and intakes that MUST be seen within a certain time frame, it gets tight, to where we are double booking our appointments... even moving intakes up to 4-6am slot just so they are placed on the schedule somewhere. Yes, we do share a schedule and we wait until Dr. Luu is finished with Harrington. We tell our med check clients to not show up until after 10a. I feel as though the schedule is just estimated time slots with clients put on close to their appointment times. Yes, it does become confusing but we all do what we can to make it work. There is A LOT of clients to see between all the sites and one doctor. So what we do in Dover is after everyone is placed on the schedule for the day (new intakes, walk in intakes etc...), we print it out and just cross off Harrington clients and wait for our turn. As you can see, Dover is seeing a lot of clients on our doctor days (med checks and intakes); close to 30, if not more. Once Dr. Luu gets on, we hustle and get moving, as we may have several clients waiting, and of course he may not get finished with you guys until well after 10a. I think that right now with just one doctor, the schedule will be tight and overbooked, but as long as we are all on the same page, we can make it work for now. As you can see, Dover has already started scheduling and are basically booked up about 5-6 weeks out from now, but have scheduled close to or after 10a. I think the issue is that we have a huge clientele and not enough doctors. We are up for any suggestions as well to make things better.

185.   To hide its practice of double-booking, Connections records are fabricated to make it look like its providers are seeing clients when, in reality, the Connections' employees have clocked out and left the facility.

186.   By way of example only, records for a provider at the Dover clinic have been fabricated to make it appear she had, for example, eleven individual sessions and a group sessions between the hours of 5:00 a.m. and 4:00 p.m. *without a single break* one day, and eight individual sessions and a group session on two other days between the hours of 5:00 a.m. and 3:00 p.m., with no appointments scheduled from 7:00 a.m. – 8:00 a.m.

187.   In reality, this team at the Dover clinic does not work twelve-hour shifts (certainly not without breaks), and is more likely to work no later than 1:30 p.m. each day.

188.   McKay and Devaney frequently reminded Connections' employees of their billing targets.   Devaney repeatedly pressured Connections' employees to meet their billing targets, and demanded detailed plans as to how they were going to meet their targets.

189.   Zoe Timme ("Timme"), Director of Community Behavioral Health Services at Connections, also pressured Connections employees to make their targeted hours.   For example, on or about February 24, 2014, Timme told Mr. Spruill and others she was "very concerned about the number of service hours you have entered so far this month.   This is a critical element of your job at Connections and it is inexcusable to simply neglect documentation.   These notes should be entered on a daily basis in order to adequately document the services you provide."

190.   As of July 8, 2014, Chris Devaney gave the ACT1 team in Newark "until the end of the day [on July 8, 2014] to add June hours."   The team was instructed to "go back into links and [their] schedules to review [their] June hours and add what [they] may have missed."

191.   On or about November 1, 2017, McKay changed the billing targets, and all counselors, site managers, LCSWs, LPCMHs, peer specialists, CADCs, physicians and other Connections' employees were expected to meet these new targets, despite not picking up any additional hours, overtime being prohibits and no influx of new patients.   As a one-time incentive, staff members who met their November 2017 billing targets, were eligible for a $100 bonus.

192.   Connections tracked its employees' actual production to goal in various ways, including on a monthly "Outpatient Billing Target Report." Ironically, the June 2018 Outpatient Billing Target Report was named "Top Secret.xlsx."  Despite threatening "corrective actions for everyone who [was] yellow" in May 2017, when McKay circulated the billing targets for October 2017, she voiced her disappointment: "Some of these are god awful."  By March 2018, McKay demanded "a specific corrective action plan for each person who [was] highlighted in yellow."

193.   Faced with this pressure and threat of termination, Connections' employees constantly thought of creative ways to generate additional revenue. For example, on or about October 16, 2018, Mr. Spruill proposed an idea to Baker he thought might work to increase billing, and asked Baker to obtain

71

McKay and/or Devaney's approval before he implemented this plan for generating more revenue for Connections.

**G.      Dosing Clients Before They Are Seen By A Physician and A Licensed Provider.**

194.    Contrary to its policy, Connections doses clients before they are seen by Connections' doctors and licensed counselors.  In one example, on or about January 25, 2016, Ms. Spruill uncovered two clients who were "guest dosing" at the Millsboro clinic before they had gone through Connections' intake procedure or been in the clinic for thirty days.  These clients were not on the doctors' schedule for an intake, and they were scheduled to see Dr. Udezue.  As Ms. Spruill observed, "Ridiculous! … I suppose they were just going to keep sending him as a guest doser.  There are two more like him here now, that have also not seen the dr and are guest dosing."

195.    On or about July 19, 2017, Pringle reminded Connections' staff:

> Please make sure that when you schedule a Client for their annual CPE **they also must be scheduled with the Doctor who is prescribing their medication, they have to see both the NP, PA, and The Doctor that is prescribing their medication on the same day.  Please Nurses go back and audit your MAT charts and if this have not happen make appointments with the Doctor ASAP please if anyone have any questions or concerns please let know.  Directors can you please add this to your chart Auditors list of medical documentation that should be completed annually**. (emphasis in original)

72

196.   In another example, Connections began dosing a client on or about March 23, 2018 and by May 24, 2018, the client still have not seen a doctor or licensed counselor.

197.   As Ms. Spruill stated in her May 24, 2018 email to Johanna Johnson and the Dover AOD team:

> This CAN'T Happen!  Clients cannot be dosing with us for 2 months with us not seeing them!!!!  If this person died on our watch, we would be screwed!!!  Unacceptable!  They need to be seen by a counselor within a week or they don't get a freakin DOSE!!!!!!!  I don't give a damn if they are MAD!!!!!!

198.   During an audit on January 29, 2019, Johanna Johnson ("Johnson"), Nurse Manager at the Dover and Harrington clinic, found a client was referred and added to the Dover clinic's per diem as of January 24, 2019. However, he "never started/transferred with Dover. Last dosing with Harrington 1/24/19."  She admonished Harrington Nurses to:

> Please make sure before referring/transferring programs, that client has showed to new clinic. **This client has been getting billed as dosing with Dover since 1/24/19 but has not**.  Wait until last does is verified before changing over the programs. (emphasis added)

**H.    Connections Bills DSAMH and Medicaid for the Same Claims.**

199.   When an uninsured client presents at Connections for treatment, Connections submits a claim to DSAMH for reimbursement for services provided to that client.

200.   Upon information and belief, Hicks prepares the claim and submits a hard copy of the claim to DSAMH.

201.   Based on the information provided to DSAMH indicating that the client is uninsured, DSAMH approves these claims and reimburses Connections.

202.   Connections also enrolls the uninsured client in Medicaid and submits a claim to Medicaid for the services provided to the client through CareLogic.   Thus, Connections seeks reimbursement from Medicaid for the same services it seeks and ultimately receives reimbursement from DSAMH.

203.   Once the client is enrolled in Medicaid, Medicaid also reimburses Connections for these services causing Connections to be reimbursed twice for the same services, once by DSAMH and once by Medicaid.

204.   Connections does not return either of these payments to DSAMH or Medicaid.

**I.     Connections Submits Claims to Medicare Knowing Such Claims Will Be Rejected, and Then Submits the Claims to DSAMH.**

205.   Connections routinely submits claims for MAT services to Medicare knowing such claims will be denied.

206.   After Medicare denies the claim, Connections submits the claim to DSAMH for reimbursement, relying on DSAMH's coverage of necessary treatment not otherwise covered by alternative sources.

207.   Although this practice results in no loss to Medicare, it constitutes submission or presentment of false claims.   In addition, this practice wastes the scarce resources made available to those who need the services Medicare provides.

**J.   Connections Unbundles Billing Codes to Fraudulently Increase Reimbursement.**

208.   The Manual allows for reimbursement of IOP services, including group and individual therapy, assessments, counseling, crisis intervention, education, depending on the type, amount and frequency of services provided.

209.   For IOP per diem claims, "the services must be delivered in accredited programs where there is a licensed practitioner on-site and supervising unlicensed staff and the individuals must meet admission criteria for a higher level or care as specified in the provider manual."   Manual at 44-45.

210.   Claims for reimbursement for IOP services are submitted under Code H0015, and require not less than nine and no more than nineteen hours of contact per week, with a minimum of three contact days per week.

211.   Connections frequently fails to provide the minimum required nine contact hours per week.  Thus, to maximize its reimbursement and avoid the nine-hour minimum required to bill for IOP services, Connections unbundles these services and bills them as individual services.

212.   Connections bills for these IOP services on a per unit basis rather than a per diem basis, and submits unbundled claims that allows it to receive a larger reimbursement than it is entitled to receive for these services.

## IV.   GOVERNING LAW

### A.   Medicare

213.   In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program.  Medicare is a federally-funded health insurance program primarily benefitting the elderly.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. § 426 *et seq*.

214.   The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

215.   To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries."   42 U.S.C. § 1395(h).   Fiscal

intermediaries, typical insurance companies, are responsible for processing and paying claims and auditing cost reports.

216.   When providers such as Connections enroll for Medicare, they complete the Medicare Enrollment Application, *i.e.* Form CMS-855B ("Medicare Application").  Section 14 of the Medicare Application explains the penalties for deliberately falsifying information to gain or maintain enrollment in the Medicare program, including those under the FCA:

3.  The Civil False Claims Act, 31 U.S.C. § 3729, imposes civil liability, in part, on any person who:

 a) knowingly presents, or causes to be presented, to an officer or any employee of the United States Government a false or fraudulent claim for payment or approval;

 b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or

 c) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

The Act imposes a civil penalty of $5,000 to $10,000 per violation, plus three times the amount of damages sustained by the Government.

217.   Section 15 of the Medicare Applications must be signed by an authorized official, *i.e.* "an appointed official … to whom the organization has granted the legal authority to enroll it in the Medicare program, to make changes or updates to the organization's status in the Medicare program, and to commit the organization to fully abide by the statutes, regulations, and program instructions of the Medicare program."  The Medicare Applications suggests the authorized official should be the organization's chief executive officer, chief financial officer, general partner, chairman of the board or direct owner.  By signing the Medicare Application, "an authorized official binds

the supplier to all of the requirements listed in the Certification Statement and acknowledges that the suppler may be denied entry to or revoked from the Medicare program if any requirements are not met."

218.   The Medicare Application requires the applicant to meet and maintain additional requirements to bill to the Medicare program, and by signing the Medicare Applications the applicant "is attesting to having read the requirements and understanding them."

219.   For example, in order to bill the Medicare program, providers agree to adhere to, *inter alia*, the following:

2.   I have read and understand the Penalties for Falsifying Information, as printed in this application. I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare, or any deliberate alteration of any text on this application form, may be punished by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare billing privileges, and/or the imposition of fines, civil damages, and/or imprisonment.

3.   I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

4.   Neither this supplier, nor any five percent or greater owner, partner, officer, director, managing employee, authorized official, or delegated official thereof is currently sanctioned, suspended, debarred, or excluded by the Medicare or State Health Care Program, e.g., Medicaid program, or any other Federal program, or is otherwise prohibited from supplying services to Medicare or other Federal program beneficiaries.

5.   I agree that any existing or future overpayment made to the supplier by the Medicare program may be recouped by Medicare through the withholding of future payments.

6.   I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

220. The Medicare Application must be signed in ink, and if the signature is deemed not an original, the Medicare Application will not be processed.

221. According to the Medicare Claims Processing Manual, Medicare pays claims submitted by clinical social workers at 75% of the Medicare Physician Fee Schedule. The CMS currently recognizes LCSWs, and Medicare Part B covers LCSWs.

222. Medicare does not authorize LCSWs to bill for services furnished incident to their own professional services. In other words, persons they supervise may not bill Medicare under a LCSW's NPI for services performed by that individual under the supervision of the LCSW.

223. Medicare currently considers, *inter alia*, LPCMHs, LMFTs and CADCs "non-eligible" providers. Thus, LPCMHs, LMFTs and CADCs may not contract with Medicare, submit claims to Medicare, or be reimbursed by Medicare.

224. The Medicare Health Insurance Claim Form, *i.e.* Form CMS-1500, warns:

> NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties. (emphasis in original).

225.   When a provider signs and submits a Form CMS-1500, the provider certifies:

> **1) the information on this form is true, accurate and complete**; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; **4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section**.   For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.
>
> * * *
>
> No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32) (emphasis added).

226.   Form   CMS-1500   warns   providers   seeking   Medicare reimbursement:

> NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws

227. Each provider submitting a Form CMS-1500 for Medicaid reimbursement certifies:

> I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

> I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

228. By signing the Form CMS-1500, the provider certifies:

> I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

229. Form CMS-1500 warns providers seeking Medicaid reimbursement:

> NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

230. "Altering claim forms, electronic claim records, medical documentation, etc. to obtain a higher payment amount" and

"[m]isrepresenting dates and descriptions of services furnished or the identity of the beneficiary or the individual who furnishes the service" are two of several examples in a non-exhaustive list of Medicare fraud examples identified in the Medicare Program Integrity Manual.

231. CMS's Medicare Fraud & Abuse: Prevention, Detection, and Reporting booklet lists as one of several examples of Medicare fraud: "Knowingly billing for services at a level of complexity higher than services actually provided or documented in the file."

## B. Medicaid

232. Delaware's Medicaid program "furnishes medical assistance to eligible Delaware low-income families and to eligible aged, blind and/or disabled people whose income is insufficient to meet the cost of necessary medical services." To qualify for Delaware's Medicaid program, individuals must be a resident of the state of Delaware, a U.S. national, citizen, permanent resident, or legal alien, in need of health care/insurance assistance, whose financial situation may be characterized as low income or very low income. For example, in order to qualify, an individual with four members in her household must have an annual household income before taxes below $32,178. "For Adult Medicaid the individual must be between the ages of 19 and 64, and for Youth Medicaid the individual must be between the ages

of 6 and 18. Some individuals must meet specific technical reasons such as age, pregnancy, or disability."

233.  Delaware's Medicaid program is administered through the Delaware Division of Medicaid & Medical Assistance (DMMA).

234.  Prior to January 2018, United Healthcare and Health Options offered Medicaid benefits to Delaware residents.  Currently, Health Options and AmeriHeath Caritas offer Medicaid benefits to approximately 200,000 of the current 225,000 Medicaid clients in Delaware.

235.  When a provider enrolls with Medicaid in Delaware, it must enter into a contract with the State of Delaware, the Department of Health and Social Services, the Division of Medicaid and Medical Assistances, and the Delaware Medical Assistance Program ("DMAP") (the "Medicaid Enrollment Agreement").

236.  The provider must agree to the conditions stated in the Medicaid Enrollment Agreement.  For example, by applying to participate in Delaware Medicaid, the provider agrees any claim submitted by or on its behalf under the DMAP:

> shall constitute certification by the Provider that the items or services for which payment is claimed wherein compliance with the DMAP rules, regulations and policies, including but not limited to: that the items or services were actually rendered by the Provider to and medically necessary for the person identified as the DMAP eligible; that the claim does not

exceed the Provider's charge for the same or equivalent items or services provided to persons who are not DMAP eligible; that the claim is correctly coded in accordance with billing instructions prescribed by the DMAP; and, that all information submitted with or in support of the claim is true, accurate, and complete.

The DMAP agrees to reimburse the Provider for those allowable medical and related items or services provided to a DMAP eligible in amounts determined solely at the discretion of the DMAP in accordance with the Federal Medical Assistance Program or the DMAP laws and regulations. Reimbursement will be in accordance with policies as established by the DMAP. The DMAP may deny reimbursement for any cost incurred for items or services rendered not in compliance with this Contract. Payment by the DMAP is subject to the availability of State and/or Federal funds.

Prior to billing the DMAP, the Provider shall be responsible for identifying and making collection from any other third party payer who may, by insurance contractor or otherwise, be liable for all or part of the cost of items or services provided, except where waived by DMAP policy. In the event that a claim with third party liability coverage exists and has been paid by the DMAP, the Provider shall promptly reimburse the DMAP in accordance with the DMAP policies and procedures.

The Provider shall not solicit, charge, accept, or receive any money, gift or other consideration from a DMAP eligible or from any other person on behalf of the eligible for any service or item allowable under the DMAP, except to the extent that the DMAP regulations require a DMAP eligible contribution or require the Provider to bill a third party prior to billing the DMAP.

Prior to rendering any item or service, the Provider shall inform the DMAP eligible of any item or service which the Provider will deliver to him or her which will not be covered by the DMAP and for which item or service the DMAP eligible must pay.

> The Provider shall accept the amounts paid to it by the DMAP
> in accordance with the DMAP regulations as payment in full
> for such items or services.[8]

237.   By signing the Medicaid Enrollment Agreement, the provider certifies:

> I understand in endorsing or depositing checks or accepting
> electronic fund transfers that payment will be from Federal
> and State funds and that any falsification, or concealment of a
> material fact, may be prosecuted under Federal and State law.[9]

238.   Per the Medicaid Enrollment Agreement, the provider is required to make timely restitution to the DMAP "for any payments received in excess of amounts due to the Provider under the DMAP regulations or payment schedules whether such overpayment is discovered by the Provider or by the DMAP. The DMAP retains the right to offset reimbursements to be made to the Provider subsequent to the identification of an overpayment."[10]

239.   Per the Medicaid Enrollment Agreement: "The Provider is responsible for the proper licensure and actions of his/her employees.  The DMAP will regard any failure to comply with the DMAP's rules, regulations

---

[8] **Ex. 8** (Delaware Health and Social Services Medicaid Enrollment Agreement) ¶ 3.

[9] **Ex. 8** (Delaware Health and Social Services Medicaid Enrollment Agreement) ¶ 3.

[10] **Ex. 8** (Delaware Health and Social Services Medicaid Enrollment Agreement) ¶ 4.

or policies or any negligent or fraudulent act by such an employee against the DMAP as an action of the Provider."[11]

240.  Connections made the foregoing certifications and representations to participate in and submit claims for reimbursement under the Delaware Medicaid program.

241.  Connections also resubmitted and recertified the accuracy of its enrollment information on its periodic Revalidation Applications, which allow it to continue participating in and submitting claims for reimbursement under the Delaware Medicaid program.

### C.   Licensed Clinical Social Worker

242.  LCSWs in Delaware are governed by 24 *Del C.* §§ 3901 *et seq.*, and Title 24 of the Delaware Administrative Code § 3900 *et seq.*

243.  According to the Delaware Code, a "licensed clinical social worker" is "any individual duly licensed under [Title 24, Chapter 39 of the Delaware Code]."  24 *Del C.* § 3902(6).

244.  In Delaware, no person shall engage in the independent practice of clinical social work or hold himself or herself out to the public, as being qualified to practice clinical social work; or "use in connection with that

---

[11] **Ex. 8** (Delaware Health and Social Services Medicaid Enrollment Agreement) ¶ 11.

individual's name, or otherwise assume or use, any title or description conveying or tending to convey the impression that the individual is qualified to practice clinical social work," unless such person has been duly licensed under Title 24, Chapter 39 of the Delaware Code.  24 *Del C.* § 3903(a).

245.   Pursuant to Title 24 of the Delaware Administrative Code § 3900 ¶ 9.3.3, a LCSW, or any employee or supervisee of the LCSW, "must be accurately identified on any bill as the person providing a particular service, and the fee charged the client should be at the [LCSW's] usual and customary rate."

### D.    Federal False Claims Act

246.   In 1863, motivated by unscrupulous government contractors during the Civil War, Congress enacted the FCA, and it was substantially amended in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153 to strengthen and enhance enforcement of the FCA.  The 1986 Amendments increased the damages and penalties that could be recovered, increased the incentives for private citizens to come forward and identify fraudulent conduct, added protections for whistleblowers against retaliation, defined knowledge specifically, declared specific intent was unnecessary, provided for a preponderance of the evidence standard, and expanded the statute of limitations.  In 2009, the FCA was further amended by the Fraud

Enforcement and Recovery Act of 2009, which expanded the FCA to reach frauds by financial institutions and other recipients of TARP and other economic stimulus funds, reduced intent required to establish liability, and relaxed the necessary connection between the false statement and payment.

247.   The FCA provides, in pertinent part, that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the Government for a civil penalty of not less than $11,181 and not more than $22,363, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a).  The FCA defines "knowing" and "knowingly" to mean that a person, with respect to information, has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b).  A person violating the FCA shall also be liable to the Government for the costs of a civil action brought to receive any such penalty or damages.  31 U.S.C. § 3729(3).

248.   As alleged in more detail herein, Defendants knowingly violated the FCA by presenting or causing to be presented false or fraudulent claims for payment to federally-funded insurance programs for payment or approval and/or knowingly making, using or causing to be made or used false records or statements material to false or fraudulent claims to federally-funded insurance programs related to services provided by unlicensed and unsupervised Connections' employees or agents using Ms. Spruill's NPI, Dr. Ayeni's NPI, and as alleged herein, other LCSWs' NPIs, when Ms. Spruill, Dr. Ayeni and other such LCSWs did not provide (or supervise the provision of) such services.

### E.   Delaware False Claims and Reporting Act

249.   Under the DFCRA, any person who knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; or knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim shall be liable to the State for a civil penalty of not less than $10,957 and not more than $21,916, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 2015, for each act constituting a violation of this section, plus three times the amount of damages which the State sustains because of the act of that person.  6 *Del. C.* § 1201(a).

250.  A person violating the DFCRA shall also be liable for the costs of a civil action brought to recover any such penalties or damages, including payment of reasonable attorney's fees and costs.  6 *Del. C.* § 1201.

251.  As alleged in more detail herein, Defendants knowingly violated the DFCRA by presenting or causing to be presented false or fraudulent claims for payment to State-funded insurance programs for payment or approval and/or knowingly making, using or causing to be made or used false records or statements material to false or fraudulent claims to State-funded insurance programs related to services provided by unlicensed and unsupervised Connections' employees or agents using Ms. Spruill's NPI, Dr. Ayeni's NPI, and as alleged herein, other LCSWs' NPIs, when Ms. Spruill, Dr. Ayeni and other such LCSWs did not provide (or supervise the provision of) such services.

252.  The FCA and the DFCRA both allow any person having information about false or fraudulent claims to bring an action for herself, and on behalf of the Government and the State, respectively, and to share in any recovery.  Relators seek through this action to recover all available damages, civil penalties, and other relief for State and federal violations alleged herein.

253.  Although the precise amount of the loss from Defendants' misconduct alleged in this action cannot be determined prior to discovery, it

is estimated that the damages and civil penalties that may be assessed against
Defendants under the facts alleged herein amount to millions of dollars.

### ADDITIONAL FALSE CLAIMS ACT AND DELAWARE FALSE CLAIMS AND REPORTING ACT ALLEGATIONS

254.    Connections' bill-to practice resulted in Connections' unlicensed
employees and/or agents who were not supervised by Ms. Spruill or Dr. Ayeni
submitting claims for reimbursement to Medicaid and Medicare under Ms.
Spruill's NPI and Dr. Ayeni's NPI.

255.    Here, Connections' use of Ms. Spruill's NPI and Dr. Ayeni's NPI
failed to satisfy the plain meaning of the word "supervise" because neither
Ms. Spruill nor Dr. Ayeni directed nor inspected the work, actions, or
performance of, nor oversaw the work of the Connections' employees and/or
agents who used their NPI, as described herein.

256.    Currently, the Delaware Legislature, when credentialing mental
health screeners, defines "supervision of unlicensed mental health
professionals by a psychiatrist" as:

> an unlicensed mental health professionals who need to work
> under a psychiatrist licensed to practice medicine will perform
> this work under their organization's practice standards and
> guidelines.  This includes requirements that the credentialed
> mental health screener discuss the individual in care's issues
> on the phone or through telepsychiatry with the supervising
> psychiatrist at the time of the detainment decision and assuring
> that this psychiatrist agrees and countersigns the decision
> made.    An  electronically  transmitted  copy  or  original

91

detainment form with the supervising psychiatrist's signature will need to be placed in the client's medical record at the facility or site where the detainment occurred within 24 hours.

257.   The term "supervise," in the context of a state's Medicaid plans, has been defined as "[t]o oversee," "to have the oversight of, superintend the execution or performance of (a thing)...."

258.   Defendants submitted false claims to federal and state-funded insurance program for payment for services provided by non-credentialed and unsupervised providers who are not permitted to bill federal and state-funded insurance programs for their services.

259.   When submitting claims to federal and state-funded insurance programs, Defendants' certified that the claims were accurate, truthful and complete.

260.   The federal and state-funded insurance programs paid the false or fraudulent claims based on Defendants' certification that LCSWs were providing these services and/or had supervised the provision of these services when they did not.

261.   In the instances where Dr. Ayeni's NPI was used without Dr. Ayeni seeing clients or supervising the provision of services, the federal and state-funded insurance programs paid the false or fraudulent claims based on

Defendants' certification that physicians were providing these services and/or had supervised the provision of these services when they did not.

262.   Connections knowingly billed the Government, through its Medicare and Medicaid programs, and Delaware, through its DSAMH program, *inter alia*, for clients that do not have Medicaid or any other insurance, and when Medicare or any other insurance company rejects its claim, for services purportedly provided by Ms. Spruill, a LCSW, using Ms. Spruill 's NPI, that were not performed by Ms. Spruill, and were not supervised by Ms. Spruill (or any other LCSW), and for Dr. Ayeni, a physician, using his NPI that were not performed by nor supervised by Dr. Ayeni.   Instead, these services were provided by Connections' unlicensed agents or employees who are not entitled to bill Medicaid for their services unless they are properly supervised by a LCSW or a physician.   Such actions were designed to state or imply that Ms. Spruill or Dr. Ayeni provided these services to Connections' clients and/or supervised the provision of these services, which is untrue.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

263.   Connections knowingly made, used or caused to be made or used false records or statements, such as the claims for reimbursement, and presented, or caused to be presented, claims for reimbursement on forms, such as the Form CMS-1500 and its electronic equivalent, which were material to the Government's and Delaware's decisions to pay the claims, indicating Ms. Spruill or Dr. Ayeni provided these services and/or supervised the provision of these services when, in reality, Connections' unlicensed and unsupervised agents or employees provided these services.  Such action was designed to state or imply that Ms. Spruill or Dr. Ayeni provided these services to Connections' clients and/or supervised the provision of these services, which is untrue.  Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

264.   Defendants knowingly presented, or caused to be presented claims for reimbursement and/or knowingly made, used or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate; (b) the claim complies with all applicable Medicare and/or Medicaid

laws, regulations and program instructions for payment; (c) the services rendered were personally furnished by the provider listed on the claim or by an employee under the provider's supervision; and (d) the provider whose NPI is listed on the claim was the primary individual rendering the services.  *See* Form CMS-1500.  Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

265.  Defendants knowingly presented, or caused to be presented claims for reimbursement and/or knowingly made, used or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment.  For example, Connections failed to disclose that unlicensed and unsupervised individuals provided the services, rather than the providers whose NPIs are reflected on the claims for reimbursement.  Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

266. Defendants violated, and continue to violate, the FCA and the DFCRA by knowingly submitting, causing to be submitted and continuing to submit and cause to be submitted claims for reimbursement where the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations. In addition, Defendants violated, and continue to violate, the FCA and the DFCRA by knowingly making, using, or causing to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations.

267. For example, instead of Ms. Spruill (or another LCSW) providing the services for which Connections sought and obtained reimbursement on the basis of the fraudulent use of Ms. Spruill's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Ms. Spruill, a LCSW, provided or supervised the provision of these services. By way of further example, instead of Dr. Ayeni (or another physician) providing the services for which Connections sought and obtained reimbursement on the basis of the

fraudulent use of Dr. Ayeni's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Dr. Ayeni, a physician, provided or supervised these services.  As a result, Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

268.   Defendant McKay has had knowledge that Connections' agents and employees were submitting these false and fraudulent claims since at least prior to August 2013.

269.   McKay abdicated her responsibility and authority to prevent or correct the false billings, and as a result Connections obtained and continues to obtain substantial financial benefit to the detriment of vulnerable Delawareans.

270.   McKay, as Connections' founder, chief executive officer and president, knew or had reason to know that Connections' unlicensed and unsupervised employees were submitting these false claims, and that Connections is benefitting from these false claims while robbing Delawareans of potentially life-saving resources.

271.   McKay knew, or had reason to know, that Connections employees required clients to submit to medically unnecessary intakes as part of MacKay and Connections' campaign to increase revenue.

272.   McKay knew, or had reason to know, that Connections employees manipulated the length of services provided to Connections' clients in Connections' records to meet arbitrary billing targets designed to pad Connections' bottom line set by McKay through, *inter alia*, (i) seeing clients for less than the time required to justify the reimbursement Connections sought; (ii) double-booking clients; and (iii) fabricating time records to make it appear as if they were treating clients when they had clocked out and left the facility.

273.   McKay knew, or had reason to know, that Connections employees were dosing clients before they were seen by physicians or licensed providers, which was against Connections' policy, among other things.

274.   McKay knew, or had reason to know, that Connections employees billed and were reimbursed by DSAMH and Medicaid for the same claims, and did not return to either DSAMH or Medicaid the duplicative reimbursement.

275.   McKay knew, or had reason to know, that Connections employees billed Medicare knowing the claim for reimbursement would be rejected, and then billed DSAMH.

276.   McKay knew, or had reason to know, that Connections employees unbundled IOP services when, for example, they failed to meet the minimum nine hours of required weekly contact to increase Connections' revenues.

277.   McKay and others at Connections violated Connections' policy of not retaliating against employees for reporting suspected fraud by terminating Ms. Spruill and Mr. Spruill.

278.   After Ms. Spruill was terminated, Connections management sent an email to the employees in the Dover and Harrington clinics instructing them to no longer use Ms. Spruill as the "bill to" person.

279.   Connections has knowledge that its agents and employees are submitting these false claims, and that Connections is benefitting financially from the false claims.

**COUNT I**
**Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**against All Defendants**

280.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

281.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Government, through its Medicare and Medicaid programs, and Delaware, through Medicaid and its DSAMH program.  Such claims include claims for services using Ms. Spruill's NPI when the services were neither performed by her nor supervised by her or any other LCSW.  Instead, these services were provided by Connections' unlicensed agents or employees who are not entitled to bill Medicaid for their services unless they are properly supervised by a LCSW, such as Ms. Spruill.  Such action was designed to state or imply that Ms. Spruill provided these services to Connections' clients and/or supervised the provision of these services, which is untrue.

282.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Government, through is Medicare program, claims for services using Ms. Spruill's NPI when the services were not performed by her nor any other

LCSW.  Instead, these services were provided by Connections' unlicensed agents or employees who are not entitled to bill Medicare for their services. Such action was designed to state or imply that Ms. Spruill provided these services to Connections' clients, which is untrue.

283.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate; (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment; (c) the services rendered were personally furnished by the provider listed on the claim or by an employee under the provider's supervision; and (d) the provider whose NPI is listed on the claim was the primary individual rendering the services.

284.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment.  For example, Connections represented that the services were provided by the providers whose NPIs are reflected on the claims for reimbursement, and failed to disclose that

unlicensed and unsupervised individuals provided the services. Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

285.   Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly submitting, causing to be submitting and continuing to submit and cause to be submitted claims for reimbursement where the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations. For example, instead of Ms. Spruill (or another LCSW) providing the services for which Connections sought and obtained reimbursement on the basis of the fraudulent use of Ms. Spruill's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Ms. Spruill, a LCSW, provided or supervised the provision of these services.

286.   These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or state-funded insurance programs, indicating Ms. Spruill provided these services and/or supervised the provision of these services when, in reality,

Connections' unlicensed and unsupervised agents or employees provided these services.

287.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

288.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

289.   Accordingly, Defendants are liable for treble damages, civil penalties, and the costs of this action under 31 U.S.C. § 3729(a)(1) and (3).

**COUNT II**
**Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) against all Defendants**

290.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

291.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, including, but not limited to claims for reimbursement, and submitted claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, and, as alleged above, to cause claims to be paid

or approved by the Government, Delaware and/or federal and/or State-funded insurance programs.

292.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, including, but not limited to claims for reimbursement, and submitted claims for reimbursement for services provided to Medicare recipients on forms such as the Form CMS-1500 and its electronic equivalent, and, as alleged above, to cause claims to be paid or approved by the Government, Delaware and/or federal and/or state-funded insurance programs.

293.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate; (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment; (c) the services rendered were personally furnished by the provider listed on the claim or by an employee under the provider's supervision; and (d) the provider whose NPI is listed on the claim was the primary individual rendering the services.

294. Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment. For example, Connections represented that the services were provided by the providers whose NPIs are reflected on the claims for reimbursement, and failed to disclose that unlicensed and unsupervised individuals provided the services. Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

295. Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly making, using, or causing to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations. For example, instead of Ms. Spruill (or another LCSW) providing the services for which Connections sought and obtained reimbursement on the basis of the fraudulent

use of Ms. Spruill's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Ms. Spruill, a LCSW, provided or supervised the provision of these services.

296.   These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or State-funded insurance programs, indicating Ms. Spruill provided these services and/or supervised the provision of these services when, in reality, Connections' unlicensed and unsupervised agents or employees provided these services.

297.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

298.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

299.   Accordingly, Defendants are liable for treble damages, civil penalties, and the costs of this action under 31 U.S.C. § 3729(a)(1) and (3).

**COUNT III**
**Violation of the Delaware False Claims and Reporting Act, 6 *Del.***
***C.* § 1201(a)(1) against All Defendants**

300.   Relators re-allege and incorporate by reference the allegations

contained in the preceding paragraphs of this Complaint as if fully set forth

herein.

301.   Through the acts described in this Complaint, Defendants

knowingly presented, or caused to be presented, to the Government, through

its Medicaid program, and Delaware through its DSAMH program, claims for

services using Ms. Spruill's NPI when the services were neither performed by

her nor supervised by her or any other LCSW.  Instead, these services were

provided by Connections' unlicensed agents or employees who are not

entitled to bill Medicaid for their services unless they are properly supervised

by a LCSW, such as Ms. Spruill.  Such action was designed to state or imply

that Ms. Spruill provided these services to Connections' clients and/or

supervised the provision of these services, which is untrue.

302.   Through the acts described in this Complaint, Defendants

knowingly presented, or caused to be presented claims for reimbursement on

forms such as the Form CMS-1500 and its electronic equivalent, while falsely

certifying, *inter alia*: (a) the information they have submitted is truthful and

accurate; (b) the claim complies with all applicable Medicare and/or Medicaid

107

laws, regulations and program instructions for payment; (c) the services rendered were personally furnished by the provider listed on the claim or by an employee under the provider's supervision; and (d) the provider whose NPI is listed on the claim was the primary individual rendering the services.

303.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment.   For example, Connections represented that the services were provided by the providers whose NPIs are reflected on the claims for reimbursement, and failed to disclose that unlicensed and unsupervised individuals provided the services.   Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

304.   Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly submitting, causing to be submitting and continuing to submit and cause to be submitted claims for reimbursement where the Government and/or State has been provided with worthless services, instead of the services paid for and

required by the regulations.  For example, instead of Ms. Spruill (or another LCSW) providing the services for which Connections sought and obtained reimbursement on the basis of the fraudulent use of Ms. Spruill's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Ms. Spruill, a LCSW, provided or supervised the provision of these services.

305.   These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or state-funded insurance programs, indicating Ms. Spruill provided these services and/or supervised the provision of these services when, in reality, Connections' unlicensed and unsupervised agents or employees provided these services.

306.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

307.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

308.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

309.   Accordingly, Defendants are liable for treble damages, civil penalties and the cost of this action under 6 *Del. C.* § 1201(a).

## COUNT IV
## Violation of the Delaware False Claims and Reporting Act, 6 *Del. C.* § 1201(a)(2) against All Defendants

310.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

311.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, including but not limited to claims for reimbursement, and submitted claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, as alleged above, to cause claims to be paid or approved by the Government, Delaware and/or federal and/or state-funded insurance programs.

312.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement  on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate; (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and

program instructions for payment; (c) the services rendered were personally furnished by the provider listed on the claim or by an employee under the provider's supervision; and (d) the provider whose NPI is listed on the claim was the primary individual rendering the services.

313. Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment. For example, Connections represented that the services were provided by the providers whose NPIs are reflected on the claims for reimbursement, and failed to disclose that unlicensed and unsupervised individuals provided the services. Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

314. Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly making, using, or causing to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that

the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations.  For example, instead of Ms. Spruill (or another LCSW) providing the services for which Connections sought and obtained reimbursement on the basis of the fraudulent use of Ms. Spruill's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Ms. Spruill, a LCSW, provided or supervised the provision of these services.

315.   These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or state-funded insurance programs, indicating Ms. Spruill provided these services and/or supervised the provision of these services when, in reality, Connections unlicensed and supervised agents or employees provided these services.

316.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

317.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

318.   Accordingly, Defendants are liable for treble damages, civil penalties and the cost of this action under 6 *Del. C.* § 1201(a).

## COUNT V
### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) against All Defendants

319.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein .

320.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Government, through its Medicare and Medicaid programs, and Delaware, through Medicaid and its DSAMH program.  Such claims include claims for services using Dr. Ayeni's NPI when the services were neither performed by Dr. Ayeni nor supervised by him or any other physician.  Instead, these services were provided by Connections' unlicensed agents or employees who are not entitled to bill Medicaid for their services unless they are properly supervised by a physician, such as Dr. Ayeni.  Such action was designed to state or imply that Dr. Ayeni provided these services to Connections' clients and/or supervised the provision of these services, which is untrue.

321.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to

the Government, through is Medicare program, claims for services using Dr. Ayeni's NPI when the services were not performed by him nor any other physician. Instead, these services were provided by Connections' unlicensed agents or employees who are not entitled to bill Medicare for their services. Such action was designed to state or imply that Dr. Ayeni provided these services to Connections' clients, which is untrue.

322. Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate; (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment; (c) the services rendered were personally furnished by the provider listed on the claim or by an employee under the provider's supervision; and (d) the provider whose NPI is listed on the claim was the primary individual rendering the services.

323. Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment. For example, Connections

represented that the services were provided by the providers whose NPIs are reflected on the claims for reimbursement, and failed to disclose that unlicensed and unsupervised individuals provided the services. Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

324. Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly submitting, causing to be submitting and continuing to submit and cause to be submitted claims for reimbursement where the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations. For example, instead of Dr. Ayeni (or another physician) providing the services for which Connections sought and obtained reimbursement on the basis of the fraudulent use of Dr. Ayeni's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Dr. Ayeni, a physician, provided or supervised the provision of these services.

325. These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or state-funded insurance programs, indicating Dr. Ayeni provided these

services and/or supervised the provision of these services when, in reality, Connections' unlicensed and unsupervised agents or employees provided these services.

326.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

327.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

328.   Accordingly, Defendants are liable for treble damages, civil penalties, and the costs of this action under 31 U.S.C. § 3729(a)(1) and (3).

## COUNT VI
### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) against all Defendants

329.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

330.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, including, but not limited to claims for reimbursement, and submitted claims for reimbursement on forms such as the Form CMS-1500

and its electronic equivalent, and, as alleged above, to cause claims to be paid or approved by the Government, Delaware and/or federal and/or State-funded insurance programs.

331. Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, including, but not limited to claims for reimbursement, and submitted claims for reimbursement for services provided to Medicare recipients on forms such as the Form CMS-1500 and its electronic equivalent, and, as alleged above, to cause claims to be paid or approved by the Government, Delaware and/or federal and/or state-funded insurance programs.

332. Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate; (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment; (c) the services rendered were personally furnished by the provider listed on the claim or by an employee under the

provider's supervision; and (d) the provider whose NPI is listed on the claim was the primary individual rendering the services.

333.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment.   For example, Connections represented that the services were provided by the providers whose NPIs are reflected on the claims for reimbursement, and failed to disclose that unlicensed and unsupervised individuals provided the services.   Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

334.   Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly making, using, or causing to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations.   For example,

instead of Dr. Ayeni (or another physician) providing the services for which Connections sought and obtained reimbursement on the basis of the fraudulent use of Dr. Ayeni's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Dr. Ayeni, a physician, provided or supervised the provision of these services.

335.   These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or State-funded insurance programs, indicating Dr. Ayeni provided these services and/or supervised the provision of these services when, in reality, Connections' unlicensed and unsupervised agents or employees provided these services.

336.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

337.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

338.   Accordingly, Defendants are liable for treble damages, civil penalties, and the costs of this action under 31 U.S.C. § 3729(a)(1) and (3).

**COUNT VII**
**Violation of the Delaware False Claims and Reporting Act, 6 *Del. C.***
**§ 1201(a)(1) against All Defendants**

339.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

340.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented, to the Government, through its Medicaid program, and Delaware through its DSAMH program, claims for services using Dr. Ayeni's NPI when the services were neither performed by him nor supervised by him or any other physician.   Instead, these services were provided by Connections' unlicensed agents or employees who are not entitled to bill Medicaid for their services unless they are properly supervised by a physician, such as Dr. Ayeni.   Such action was designed to state or imply that Dr. Ayeni provided these services to Connections' clients and/or supervised the provision of these services, which is untrue.

341.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate; (b) the claim complies with all applicable Medicare and/or Medicaid

120

laws, regulations and program instructions for payment; (c) the services rendered were personally furnished by the provider listed on the claim or by an employee under the provider's supervision; and (d) the provider whose NPI is listed on the claim was the primary individual rendering the services.

342.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment.   For example, Connections represented that the services were provided by the providers whose NPIs are reflected on the claims for reimbursement, and failed to disclose that unlicensed and unsupervised individuals provided the services.   Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

343.   Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly submitting, causing to be submitting and continuing to submit and cause to be submitted claims for reimbursement where the Government and/or State has been provided with worthless services, instead of the services paid for and

required by the regulations.  For example, instead of Dr. Ayeni (or another physician) providing the services for which Connections sought and obtained reimbursement on the basis of the fraudulent use of Dr. Ayeni's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Dr. Ayeni, a physician, provided or supervised the provision of these services.

344.   These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or state-funded insurance programs, indicating Dr. Ayeni provided these services and/or supervised the provision of these services when, in reality, Connections' unlicensed and unsupervised agents or employees provided these services.

345.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

346.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

347.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

348.   Accordingly, Defendants are liable for treble damages, civil penalties and the cost of this action under 6 *Del. C.* § 1201(a).

## COUNT VIII
### Violation of the Delaware False Claims and Reporting Act, 6 *Del. C.* § 1201(a)(2) against All Defendants

349.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

350.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, including but not limited to claims for reimbursement, and submitted claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, as alleged above, to cause claims to be paid or approved by the Government, Delaware and/or federal and/or state-funded insurance programs.

351.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement  on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate; (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and

program instructions for payment; (c) the services rendered were personally furnished by the provider listed on the claim or by an employee under the provider's supervision; and (d) the provider whose NPI is listed on the claim was the primary individual rendering the services.

352. Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment. For example, Connections represented that the services were provided by the providers whose NPIs are reflected on the claims for reimbursement, and failed to disclose that unlicensed and unsupervised individuals provided the services. Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

353. Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly making, using, or causing to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that

the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations.  For example, instead of Dr. Ayeni (or another physician) providing the services for which Connections sought and obtained reimbursement on the basis of the fraudulent use of Ms. Spruill's NPI, an unlicensed and unsupervised individual provided these services, and Connections billed Medicare and/or Medicaid as if Dr. Ayeni, a physician, provided or supervised the provision of these services.

354.   These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or state-funded insurance programs, indicating Dr. Ayeni provided these services and/or supervised the provision of these services when, in reality, Connections unlicensed and supervised agents or employees provided these services.

355.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

356.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

357.   Accordingly, Defendants are liable for treble damages, civil penalties and the cost of this action under 6 *Del. C.* § 1201(a).

## COUNT IX
### Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) against All Defendants

358.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

359.   Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Government, through its Medicare and Medicaid programs, and Delaware, through Medicaid and its DSAMH program, including, *inter alia*, (i) fabricating medical records; (ii) concealing their noncompliance from external auditors; (iii) submitting claims for reimbursement for medically unnecessary intake sessions; (iv) manipulating the length of services provided in billing records to reflect more time than Connections' providers actually spent with the clients; (v) double-booking clients; (vi) fabricating time records; (vii) dosing clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services; (viii) submitting the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (ix) submitting claims to

Medicare knowing those claims would be rejected before submitting them to DSAMH, and (x) unbundling MAT services to increase its reimbursement, all designed to increase Connections' bottom line rather than provide any additional care to Connections' clients.

360. Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate and (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment.

361. Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment.  For example, Connections represented that the services were medically necessary and failed to disclose these clients had previously participated in an intake session and the additional intake was unnecessary and designed to increase Connections' revenue.  In addition, Connections: (i) fabricated medical records; (ii) concealed their noncompliance from external auditors; (iii) manipulated the length of services

provided in billing records to reflect more time than Connections' providers actually spent with the clients; (iv) double-booked clients; (v) fabricated time records; (vi) dosed clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services; (vii) submitted the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (viii) submitted claims to Medicare knowing those claims would be rejected before submitting them to DSAMH, and (ix) unbundled MAT services to increase its reimbursement, all designed to increase Connections' bottom line rather than provide any additional care to Connections' clients.    to increase its bottom line rather than provide any additional care to Connections' clients.  Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

362.  Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly submitting, causing to be submitting and continuing to submit and cause to be submitted claims for reimbursement where the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations.  For example, Connections represented that the intake sessions were medically necessary and failed to disclose that these

clients had previously participated in an intake session and the additional intake was unnecessary and  designed to increase Connections' revenue.  In addition, Connections: (i) fabricated medical records; (ii) concealed their noncompliance from external auditors; (iii) manipulated the length of services provided in billing records to reflect more time than Connections' providers actually spent with the clients; (iv) double-booked clients; (v) fabricated time records; (vi) dosed clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services; (vii) submitted the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (viii) submitted claims to Medicare knowing those claims would be rejected before submitting them to DSAMH, and (ix) unbundled MAT services to increase its reimbursement, to increase its bottom line rather than provide any additional care to Connections' clients.

363.  These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or state-funded insurance programs, indicating these intakes were medically necessary when, in reality, they were part of Connections' revenue-generating machine.

364.  Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

365.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

366.   Accordingly, Defendants are liable for treble damages, civil penalties, and the costs of this action under 31 U.S.C. § 3729(a)(1) and (3).

**COUNT X**
**Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**against all Defendants**

367.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

368.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, including, but not limited to claims for reimbursement, and submitted claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, and, as alleged above, to cause claims to be paid or approved by the Government, Delaware and/or federal and/or State-funded insurance programs.

369.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or

statements, including, but not limited to claims for reimbursement, and submitted claims for reimbursement for services provided to Medicare recipients on forms such as the Form CMS-1500 and its electronic equivalent, and, as alleged above, to cause claims to be paid or approved by the Government, Delaware and/or federal and/or state-funded insurance programs.

370. Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate and (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment.

371. Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment. For example, Connections represented that the intake services were medically necessary and failed to disclose these

clients had previously participated in an intake session and the additional intake was unnecessary and designed to increase Connections' revenue.  In addition, Connections: (i) fabricated medical records; (ii) concealed their noncompliance from external auditors; (iii) manipulated the length of services provided in billing records to reflect more time than Connections' providers actually spent with the clients; (iv) double-booked clients; (v) fabricated time records; (vi) dosed clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services; (vii) submitted the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (viii) submitted claims to Medicare knowing those claims would be rejected before submitting them to DSAMH, and (ix) unbundled MAT services to increase its reimbursement, to increase its bottom line rather than provide any additional care to Connections' clients. Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

372. Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly making, using, or causing to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its

electronic equivalent, without disclosing to the Government and the State that the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations.  For example, Connections represented that the intake sessions were medically necessary and failed to disclose that these clients had previously participated in an intake session and the additional intake was unnecessary and designed to increase Connections' revenue.   Similarly, Connections:   (i) fabricated medical records; (ii) concealed their noncompliance from external auditors; (iii) manipulated the length of services provided in billing records to reflect more time than Connections' providers actually spent with the clients; (iv) double-booked clients; (v) fabricated time records; (vi) dosed clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services; (vii) submitted the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (viii) submitted claims to Medicare knowing those claims would be rejected before submitting them to DSAMH, and (ix) unbundled MAT services to increase its reimbursement, to increase its bottom line rather than provide any additional care to Connections' clients.

373.  These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or

State-funded insurance programs, indicating these intakes were medically necessary when, in reality, they were part of Connections' revenue-generating machine.  Similarly, these false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or State-funded insurance programs, indicating: the length of services provided were accurately reflected in Connections' records when they were not and Connections' providers treated clients when its records reflected these clients were treated.  Moreover, by submitting reimbursements to DSAMH, Medicaid and Medicare, Connections was falsely indicating that it had the right to be paid by DSAMH, Medicaid and/or Medicare but not both DSAMH and Medicaid for the same claim, and not Medicare when the claims was not eligible for reimbursement by Medicare.

374.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

375.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

376.   Accordingly, Defendants are liable for treble damages, civil penalties, and the costs of this action under 31 U.S.C. § 3729(a)(1) and (3).

## COUNT XI
### Violation of the Delaware False Claims and Reporting Act, 6 *Del. C.* § 1201(a)(1) against All Defendants

377. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

378. Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Government, through its Medicare and Medicaid programs, and Delaware, through Medicaid and its DSAMH program, including, *inter alia*, (i) fabricating medical records; (ii) concealing their noncompliance from external auditors; (iii) submitting claims for reimbursement for medically unnecessary intake sessions; (iv) manipulating the length of services provided in billing records to reflect more time than Connections' providers actually spent with the clients; (v) double-booking clients; (vi) fabricating time records; (vii) dosing clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services; (viii) submitting the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (ix) submitting claims to Medicare knowing those claims would be rejected before submitting them to DSAMH, and (x) unbundling MAT services to increase its reimbursement, all

designed to increase Connections' bottom line rather than provide any additional care to Connections' clients.

379. Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate; and (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment.

380. Through the acts described in this Complaint, Defendants knowingly presented, or caused to be presented claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment.  For example, Connections represented that the intake services were medically necessary and failed to disclose these clients had previously participated in an intake session and the additional intake was unnecessary and designed to increase Connections' revenue.   In addition, Connections: (i) fabricated medical records; (ii) concealed their noncompliance from external auditors; (iii) manipulated the length of services provided in billing records to reflect more time than Connections' providers actually spent with the clients; (iv) double-booked

clients; (v) fabricated time records; (vi) dosed clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services; (vii) submitted the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (viii) submitted claims to Medicare knowing those claims would be rejected before submitting them to DSAMH, and (ix) unbundled MAT services to increase its reimbursement, to increase its bottom line rather than provide any additional care to Connections' clients. Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

381. Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly submitting, causing to be submitting and continuing to submit and cause to be submitted claims for reimbursement where the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations. For example, Connections represented that the intake sessions were medically necessary and failed to disclose that these clients had previously participated in an intake session and the additional intake was unnecessary and designed to increase Connections' revenue. In addition, Connections: (i) fabricated medical records; (ii) concealed their

noncompliance from external auditors; (iii) manipulated the length of services provided in billing records to reflect more time than Connections' providers actually spent with the clients; (iv) double-booked clients; (v) fabricated time records; (vi) dosed clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services; (vii) submitted the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (viii) submitted claims to Medicare knowing those claims would be rejected before submitting them to DSAMH, and (ix) unbundled MAT services to increase its reimbursement, to increase its bottom line rather than provide any additional care to Connections' clients.

382.   These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or state-funded insurance programs, indicating these intakes were medically necessary when, in reality, they were part of Connections' revenue-generating machine.

383.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

384.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

385.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

386.   Accordingly, Defendants are liable for treble damages, civil penalties and the cost of this action under 6 *Del. C.* § 1201(a).

## COUNT XII
**Violation of the Delaware False Claims and Reporting Act,**
**6 *Del. C.* § 1201(a)(2) against All Defendants**

387.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

388.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, including but not limited to claims for reimbursement, and submitted claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, as alleged above, to cause claims to be paid or approved by the Government, Delaware and/or federal and/or state-funded insurance programs.

389.   Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or

statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, while falsely certifying, *inter alia*: (a) the information they have submitted is truthful and accurate and (b) the claim complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment.

390. Through the acts described in this Complaint, Defendants knowingly made, used, or caused to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that they violated regulations that affected Connections' eligibility for payment. For example, Connections represented that the intake services were medically necessary and failed to disclose these clients had previously participated in an intake session and the additional intake was unnecessary and designed to increase Connections' revenue. In addition, Connections: (i) fabricated medical records; (ii) concealed their noncompliance from external auditors; (iii) manipulated the length of services provided in billing records to reflect more time than Connections' providers actually spent with the clients; (iv) double-booked clients; (v) fabricated time records; (vi) dosed clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services;

140

(vii) submitted the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (viii) submitted claims to Medicare knowing those claims would be rejected before submitting them to DSAMH, and (ix) unbundled MAT services to increase its reimbursement, to increase its bottom line rather than provide any additional care to Connections' clients. Thus, Defendants' failure to disclose their non-compliance with material statutory, regulatory and/or contractual requirements made their representations misleading half-truths.

391. Through the acts described in this Complaint, Defendants violated, and continue to violate, the FCA and DFCRA by knowingly making, using, or causing to be made or used false records or statements, such as the claims for reimbursement on forms such as the Form CMS-1500 and its electronic equivalent, without disclosing to the Government and the State that the Government and/or State has been provided with worthless services, instead of the services paid for and required by the regulations. For example, Connections represented that the intake sessions were medically necessary and failed to disclose that these clients had previously participated in an intake session and the additional intake was unnecessary and designed to increase Connections' revenue. Similarly, Connections: (i) fabricated medical records; (ii) concealed their noncompliance from external auditors; (iii) manipulated

the length of services provided in billing records to reflect more time than Connections' providers actually spent with the clients; (iv) double-booked clients; (v) fabricated time records; (vi) dosed clients before they are evaluated by a physician and a licensed counselor and submitting reimbursement for such services; (vii) submitted the same claims for reimbursement to DSAMH and Medicaid and receiving reimbursement from both, (viii) submitted claims to Medicare knowing those claims would be rejected before submitting them to DSAMH, and (ix) unbundled MAT services to increase its reimbursement, to increase its bottom line rather than provide any additional care to Connections' clients.

392.   These false records or statements were material to false or fraudulent claims made to the Government, Delaware and/or federal and/or state-funded insurance programs, indicating these intakes were medically necessary when, in reality, they were part of Connections' revenue-generating machine.

393.   Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

394.   Federal and/or State-funded insurance programs unaware of the falsity or fraudulent nature of the claims caused by Defendants, remitted, and

continue to remit, payment to Connections for these claims in reliance on Connections' certification that the claims it submits are truthful and accurate.

395.   Accordingly, Defendants are liable for treble damages, civil penalties and the cost of this action under 6 *Del. C.* § 1201(a).

## Count XIII
### Retaliation in Violation of 31 U.S.C. § 3730(h)(1) against All Defendants

396.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

397.   The False Claims Act, 31 U.S.C. § 3730(h) provides:

(h)  Relief From Retaliatory Actions.—

(1) In general.—

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2) Relief.—

Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable

> attorneys' fees. An action under this subsection may be
> brought in the appropriate district court of the United States
> for the relief provided in this subsection.

398. Defendants have an obligation under the False Claims Act to refrain from taking any retaliatory actions against employees for attempting to report or stop fraud pursuant to 31 U.S.C. § 3730(h).

399. Ms. Spruill engaged in protected activity through her efforts to stop Defendants from presenting or causing to presented false or fraudulent claims for reimbursement to the Medicare and Medicaid programs and/or knowingly making, using or causing to be made or used false records or statements material to false or fraudulent claims to the Medicare and Medicaid programs for reimbursement that use Ms. Spruill's NPI, which are designed to state or imply that Ms. Spruill provided or supervised the provision of the services to Connections' clients, notwithstanding that, in fact, unlicensed and unsupervised providers, who are not entitled to bill for their services, provided these services, in an attempt to cause, and in fact causing, the Government and Delaware to pay out more money than they owe for these services.

400. When Ms. Spruill first learned others at Connections were using her as the "bill to" person even though she was not supervising them, she questioned Connections' Director of Human Resources as to why people she

did not supervise were using her NPI.  Approximately three weeks later, she was terminated by Connections without having her concerns addressed.

401.  After being re-hired by Connections, Ms. Spruill asked her supervisor if she was aware of who, if anyone at Connections, was choosing her as the "bill to" person within EHR and thus causing Ms. Spruill to be listed as the rendering provider on the claims submitted for payment to the Government and/or Delaware.  Ms. Spruill also called Health Options to ask about the use of her NPI by individuals other than herself.  Within two months of Ms. Spruill making these inquiries, McKay requested a meeting with Ms. Spruill and Connections' Human Resources Department.  At this meeting, Ms. Spruill was initially told she was being demoted to a therapist position, and was ultimately offered a position providing "clinical chart supervision" over Connections' employees from a remove Middletown location.  Following this meeting, Ms. Spruill's supervisor became aggressive and hostile to her.  In November 2018, Connections again terminated Ms. Spruill.

402.  After Ms. Spruill highlighted Defendants' fraudulent "bill to" practices, she was threatened, harassed, and discriminated against in the terms and conditions of her employment because of the lawful acts she took to stop Defendants' further violations of the False Claims Act.

403.   In acting to stop Defendants from using her NPI to submit a False Claim to the Government and/or Delaware, Ms. Spruill made an effort "to stop 1 or more violations" of the False Claims Act.

404.   Ms. Spruill's actions were protected activity within the meaning of 31 U.S.C. § 3730(h)(1).

405.   Defendants were aware that Ms. Spruill was engaged in protected activity.

406.   Pursuant to 31 U.S.C. § 3730(h)(2), Ms. Spruill is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

### Count XIV
### Retaliation in Violation of 6 *Del. C.* § 1208
### against All Defendants

407.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

408.   The DFCRA, 6 *Del. C.* § 1208 provides:

(a) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee,

contractor, agent or associated others in furtherance of an action under this chapter or other efforts to stop 1 or more violations of this chapter.

Such relief shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. . . .

409.   Defendants have an obligation under the DFCRA to refrain from taking any retaliatory actions against employees for attempting to report or stop fraud pursuant to 6 *Del. C.* § 1208.

410.   Ms. Spruill engaged in protected activity through her efforts to stop Defendants from presenting or causing to presented false or fraudulent claims for reimbursement to the Medicare and Medicaid programs and/or knowingly making, using or causing to be made or used false records or statements material to false or fraudulent claims to the Medicare and Medicaid programs for reimbursement that use Ms. Spruill's NPI, which are designed to state or imply that Ms. Spruill provided or supervised the provision of the services to Connections' clients, notwithstanding that, in fact, unlicensed and unsupervised providers, who are not entitled to bill for their services, provided these services, in an attempt to cause, and in fact causing, the Government and Delaware to pay out more money than they owe for these services.

411.   When Ms. Spruill first learned others at Connections were using her as the "bill to" person even though she was not supervising them, she questioned Connections' Director of Human Resources as to why people she did not supervise were using her NPI.  Approximately three weeks later, she was terminated by Connections without having her concerns addressed.

412.   After being re-hired by Connections, Ms. Spruill asked her supervisor if she was aware of who, if anyone at Connections, was choosing her as the "bill to" person within EHR and thus causing Ms. Spruill to be listed as the rendering provider on the claims submitted for payment to the Government and/or Delaware.  Ms. Spruill also called Health Options to ask about the use of her NPI by individuals other than herself.  Within two months of Ms. Spruill making these inquiries, McKay requested a meeting with Ms. Spruill and Connections' Human Resources Department.  At this meeting, Ms. Spruill was initially told she was being demoted to a therapist position, and was ultimately offered a position providing "clinical chart supervision" over Connections' employees from a remove Middletown location.  Following this meeting, Ms. Spruill's supervisor became aggressive and hostile to Ms. Spruill.  In November 2018, Connections again terminated Ms. Spruill.

413.   After Ms. Spruill highlighted Defendants' fraudulent "bill to" practices, she was discharged, demoted, suspended, threatened, harassed, and

discriminated against in the terms and conditions of her employment because of the lawful acts she took to stop Defendants' further violations of the DFCRA.

414.   In acting to stop Defendants from using her NPI to submit a False Claim to the Government and/or Delaware, Ms. Spruill made an effort "to stop 1 or more violations" of the DFCRA.

415.   Ms. Spruill's actions were protected activity within the meaning of 6 *Del. C.* § 1208.

416.   Defendants were aware that Ms. Spruill was engaged in protected activity.

417.   Pursuant to 6 *Del. C.* § 1208, Ms. Spruill is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## Count XV
### Retaliation in Violation of 31 U.S.C. § 3730(h)(1)
### against All Defendants

418.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

The False Claims Act, 31 U.S.C. § 3730(h) provides:

(h)  Relief From Retaliatory Actions.—

(1) In general.—

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2) Relief.—

Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

419.   Defendants have an obligation under the False Claims Act to refrain from taking any retaliatory actions against employees for attempting to report or stop fraud pursuant to 31 U.S.C. § 3730(h).

420.   Mr. Spruill engaged in protected activity through his efforts to stop Defendants' fraudulent practices, *inter alia*, by voicing his objections to his superiors to Defendants' fraudulent billing practices and the sub-par levels of care at the Harrington clinic that failed to meet regulatory requirements.

421.   Mr. Spruill has been a vocal critic of Defendants' fraudulent practices, including by revealing the fraudulent billing practices and the sub-

par levels of care at the Harrington clinic that failed to meet regulatory requirements.

422.   After Mr. Spruill highlighted Defendants' fraudulent billing practices and the Harrington clinic's failure to comply with required regulations, he was threatened, harassed, and discriminated against in the terms and conditions of his employment because of the lawful acts he took to stop Defendants' further violations of the False Claims Act.

423.   In acting to stop Defendants' fraudulent practices, Mr. Spruill made an effort "to stop 1 or more violations" of the False Claims Act.

424.   Mr. Spruill's actions were protected activity within the meaning of 31 U.S.C. § 3730(h)(1).

425.   Defendants were aware that Mr. Spruill was engaged in protected activity.

426.   Pursuant to 31 U.S.C. § 3730(h)(2), Mr. Spruill is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## Count XVI
## Retaliation in Violation of 6 *Del. C.* § 1208
## against All Defendants

427.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

428.   The DFCRA, 6 *Del. C.* § 1208 provides:

(a) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this chapter or other efforts to stop 1 or more violations of this chapter.

Such relief shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. . . .

429.   Defendants have an obligation under the DFCRA to refrain from taking any retaliatory actions against employees for attempting to report or stop fraud pursuant to 6 *Del. C.* § 1208.

430.   Mr. Spruill engaged in protected activity through his efforts to stop Defendants' fraudulent practices by, *inter alia*, voicing his objections to

his superiors to Defendants' fraudulent billing practices and the sub-par levels of care at the Harrington clinic that failed to meet regulatory requirements.

431.   Mr. Spruill has been a vocal critic of Defendants' fraudulent practices, including by revealing the fraudulent billing practices and the sub-par levels of care at the Harrington clinic that failed to meet regulatory requirements.

432.   After Mr. Spruill highlighted Defendants' fraudulent practices billing practices and the Harrington clinic's failure to comply with required regulations, he was discharged, demoted, suspended, threatened, harassed, and discriminated against in the terms and conditions of his employment because of the lawful acts he took to stop Defendants' further violations of the DFCRA.

433.   In acting to stop Defendants' fraudulent practices, Mr. Spruill made an effort "to stop 1 or more violations" of the DFCRA.

434.   Mr. Spruill's actions were protected activity within the meaning of 6 *Del. C.* § 1208.

435.   Defendants were aware that Mr. Spruill was engaged in protected activity.

436.   Pursuant to 6 *Del. C.* § 1208, Mr. Spruill is entitled to two times the amount of back pay, interest on the back pay, and compensation for any

special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## V.   PRAYER FOR RELIEF

WHEREFORE, Relators, Malika Spruill and Douglas Spruill, request that judgment be entered against the Defendants, ordering that:

437.   Defendants cease and desist from violating 31 U.S.C. § 3729;

438.   Defendants cease and desist from violating 6 *Del. C.* § 1201, *et seq.*;

439.   Defendants pay not less than $11,181 and not more than $22,363, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each violation of 31 U.S.C. § 3729, plus three (3) times the amount of damages the Government has sustained as a result of Defendants' actions;

440.   Defendants pay not less than $10,957 and not more than $21,916 for each violation of 6 *Del. C.* § 1201, as adjusted by the Federal Civil Penalties Inflation Adjustment Act, plus three (3) times the amount of damages Delaware has sustained as a result of Defendants' actions;

441.   Defendants pay all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3729(a)(3) and 6 *Del. C.* § 1201, *et seq.*;

442.   Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and 6 *Del. C.* § 1205;

443.   Ms. Spruill be awarded all relief necessary to make her whole, including but not limited to, two times her back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees pursuant to 31 U.S.C. 3730(h);

444.   Ms. Spruill be awarded all relief necessary to make her whole, including but not limited to, reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees pursuant to 6 *Del. C.* § 1208;

445.   Mr. Spruill be awarded all relief necessary to make him whole, including but not limited to, two times him back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees pursuant to 31 U.S.C. 3730(h);

446.   Mr. Spruill be awarded all relief necessary to make him whole, including but not limited to, reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees pursuant to 6 *Del. C.* § 1208;

447.   The Government, Delaware and Relators Malika Spruill and Douglas Spruill receive such other relief as the Court deems just and proper.

## VI.   JURY TRIAL DEMANDED

Relators demand trial by a jury of twelve (12).

Dated:  June 21, 2019                    GRANT & EISENHOFER, P.A.

      */s/ Kyle J. McGee*

OF COUNSEL:                              Kyle J. McGee (# 5558)
                                        Laina M. Herbert (# 4717)
                                        123 Justison Street
Brian Mahany (WI 1065623)                Wilmington, DE 19801
Tim Granitz (WI 1088934)                 Tel: 302-622-7000
MahanyLaw                                KMcGee@gelaw.com
8112 West Bluemound Road                 LHerbert@gelaw.com
 Suite 101
Wauwatosa, WI 53213                       *Attorneys for Relators Malika*
Tel: (414) 258-2375                       *Spruill and Douglas Spruill*
Facsimile: (414) 777-0776
brian@mahanylaw.com
tgranitz@mahanylaw.com